**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John M. MURPHY,
Defendant-Appellant.**

**Nos. 84–2398, 85–1401.**

United States Court of Appeals,
Seventh Circuit.

Argued May 24, 1985.

Decided July 19, 1985.

Rehearing and Rehearing En Banc
Denied Sept. 27, 1985.

---

**1524**

Anna R. Lavin, Edward V. Hanrahan, Chicago, Ill., for defendant-appellant.

Daniel C. Murray, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY and EASTERBROOK, Circuit Judges, and SWYGERT, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

John M. Murphy was an Associate Judge of the Circuit Court of Cook County from 1972 until 1984. He was indicted in 1983 and charged with accepting bribes to fix the outcome of hundreds of cases, from drunk driving to battery to felony theft. Some of the counts on which he was convicted grew out of contrived cases staged by the FBI and federal prosecutors as part of Operation Greylord, an investigation of the Cook County courts.

The charges spanned many years and many statutes. Part I of this opinion sets out the background. Part II addresses Murphy's challenge to Operation Greylord. Part III looks at Murphy's arguments under particular statutes, Part IV at the conduct of the trial, and Part V at the decision of the district judge not to recuse himself.

I

The evidence at trial, which we now view in the light most favorable to the prosecution, showed several categories of cases in which Murphy took bribes. We separate the evidence into several groups: traffic court, "hustling," fixed felony offenses, and the cases that were contrived as part of the investigation. We omit a great deal of the evidence and describe only enough to give the general picture. Some of the events we recount are pertinent to other Greylord cases still in litigation. Our statement of the evidence and the inferences the jury could draw about Murphy's conduct is not meant to prejudge those cases.

*Traffic court.* The Cook County courts are organized into divisions, and supervisory judges assign other judges to particular divisions or courtrooms. From 1972 to early 1981 Murphy was assigned to traffic

court, which has courtrooms for major offenses (driving while intoxicated, leaving the scene of an accident, and so on) and minor offenses (such as running a red light). Judge Richard LeFevour was the Supervising Judge of traffic court; he had the authority to decide whether Murphy and other judges would hear major or minor cases.

Officer James LeFevour of the Chicago police, Richard LeFevour's cousin, was assigned to traffic court from 1969 through 1980. James LeFevour testified for the prosecution as part of an agreement under which the Government limited its charges against him to three tax offenses. He testified that beginning in 1975 he met regularly with Melvin Cantor, who would give him a list of his cases that day. James LeFevour would take the list to Judge Richard LeFevour; Judge LeFevour would assign Murphy to hear some of Cantor's cases. James LeFevour would present Murphy the list of Cantor's cases. Murphy then would find the defendants not guilty or sentence them to "supervision," an outcome defendants favored. Later in each day Cantor would give James LeFevour money to pass to Judge LeFevour and some for James to keep for a "tip."

Although Richard LeFevour kept the bribes for these cases, he put Murphy in a position to "earn" his own bribes. Richard LeFevour would assign to major cases, on a regular basis, only those judges who would "see" James LeFevour. Lawyers then would bribe some of the judges assigned to the major courtrooms. Murphy was in a major courtroom more often than most other judges.

Lawyers known as "miracle workers" occasionally met with James LeFevour and with Joseph Trunzo, another police officer assigned to traffic court. The lawyers would tell Officer LeFevour or Officer Trunzo which defendants they represented; the officers would pass the information to Murphy; after the defendant had prevailed, the lawyer would hand an envelope to the officer with $100 per case for Murphy and another $10 or so for the officer;

the officer would pass the envelope to Murphy. Prosecutors testified that although they won as many as 90% of their major traffic cases against public defenders, they almost never won a case in which the defendant was represented by one of the "miracle workers."

The testimony at the trial of this case concerned unidentified cases in traffic court. But some plays stood out, even though the players were anonymous. A prosecutor recalled one drunk driving case in which the defendant was represented by Harry Kleper, a miracle worker. The arresting police officer testified that the defendant failed the usual roadside tests of drunkenness and admitted drinking beer before driving. The defendant took the stand and did not deny imbibing; she said only that the liquor did not affect her ability to drive. Under cross-examination she admitted "feeling" the beer; the prosecutor then asked: "And don't you think it is fair to say that you were under the influence of intoxicating liquor?", to which she replied, "Yes, I guess that is a fair thing to say." Judge Murphy threw up his hands and called a recess, turning to Kleper with the remark: "Counselor, I suggest you talk to your client." As Murphy left the bench, the prosecutor heard Murphy yell down the hall to the judges' chambers: "You won't believe this. The State's Attorney just got the defendant to admit she was drunk." A few minutes later Murphy reconvened the court. Kleper asked the defendant whether she was drunk; she said no. In closing argument the prosecutor stressed the defendant's admission. Kleper did not give a closing argument. Murphy ruled: "I still have a reasonable doubt. Not guilty."

*Hustlers.* In 1981 Judge LeFevour became Presiding Judge for Cook County's First Municipal District court, which has a general jurisdiction. Many of the branch courts had been frequented by "hustlers." "Hustlers" are lawyers who stand outside the courtroom and solicit business from the people about to enter. Ethical rules long have prohibited such solicitation, and every appearance form in Circuit Court contains

a representation that solicitation did not occur. Hustling is a profitable business nonetheless, and people find ways to pursue the profits of illegitimate enterprise with the same vigor they devote to lawful activities.

The profit in hustling comes from the bail system in Illinois. A defendant required to post bail may do so by depositing 10% of the bail in cash. If the defendant is discharged, the cash deposit (less the clerk's handling fee) is returned. This payment, called the cash bond refund (CBR), also may be assigned to the defendant's lawyer as compensation for legal services. Assignment requires the approval of the court. Hustlers make their money by persuading defendants to hire them and assign the CBR, then persuading the judge to release the CBR to them.

Judge Thaddeus L. Kowalski, who presided over the court known as Branch 29 from June 1980 to March 1981, believed that hustlers cheated their clients at the same time as they violated ethical rules. Often the hustlers appeared as counsel only when the case was bound to be dismissed anyway, as they well knew. Their "representation" of the defendants simply diverted the CBRs from the defendants to the lawyers. Judge Kowalski addressed hustling in the most effective way—by eliminating its profitability. He refused to permit the hustlers to collect the CBRs. They soon deserted Branch 29. When Richard LeFevour became the presiding judge of the first district, Judge Kowalski explained to Judge LeFevour how he had cut down on hustling. Judge LeFevour praised Judge Kowalski and promptly transferred him from Branch 29 to the East Chicago Avenue Police Court, which handles criminal cases originating in the Cabrini Green housing project. Judge LeFevour replaced Kowalski with Murphy.

Hustlers flourished under Murphy, who routinely permitted them to collect the CBRs. The hustlers showed appropriate gratitude. Every month the lawyers, collectively known as the Hustlers Club, paid James LeFevour $2500. James kept $500 and gave the rest to Richard. (The sums were reduced for some months when the hustlers' take fell. Murphy was incapacitated by a broken ankle, and his replacement was apparently less compliant.) After a hustler made a certain amount, he paid an additional sum to the judge of the particular court. James LeFevour told Murphy of the Hustlers Club and Richard LeFevour's approval. Murphy told James LeFevour that he approved too.

Although Richard LeFevour kept the principal bribe, there were still rewards for Murphy. As at traffic court, Murphy was free to establish his own stable of bribe-givers. The Chicago Bar Association (CBA) maintains a Lawyer Referral Service. This service screens lawyers and assigns them to branch courtrooms to be of service to unrepresented defendants. These lawyers are potential competitors of the hustlers, and Murphy apparently cultivated them as independent sources of revenue.

Arthur Cirignani participated in the CBA's program. (The evidence at trial casts no shadows on the integrity of the CBA itself.) From June 1980 through the end of 1983 he was assigned to a courtroom three to four times a month. Whenever he was assigned to Branch 29, he paid Judge Murphy to assign cases to him rather than to continue the proceedings and allow the hustlers to claim the CBRs. For example, on June 21, 1982, Cirignani visited Murphy first thing in the morning and informed Murphy that he was there as the bar's lawyer. Murphy referred thirteen cases to Cirignani that day and allowed Cirignani to collect CBRs totalling $1,010, a return Cirignani called "excellent." On June 22 Cirignani took $200 in cash to Murphy, who accepted the money without comment. Cirignani testified that he paid Murphy then and on other occasions to ensure referrals in the future.

*Fixed cases.* Murphy threw business to lawyers; he also threw cases. Cirignani, who testified under an arrangement that he would not be prosecuted if he told the truth, described one such case. Cirignani

represented Arthur Best, charged with felony theft. The police had seized evidence from the grounds of Best's house under authority of a warrant, and Cirignani moved to suppress the evidence. On the day of the suppression hearing Cirignani visited Murphy's chambers before court began and while they were alone told Murphy that he had a "good" motion to suppress. Murphy promised to "take a look at it." Judge Murphy later granted the motion to suppress, giving no reasons. The prosecutor then dismissed the case against Best. Before leaving the courthouse Cirignani gave Murphy an envelope containing $300. Cirignani received a CBR of $1800 in the case, and the client also paid $700 directly. (As it turned out, Cirignani's success was short-lived. The Appellate Court of Illinois reversed. *People v. Best*, 97 Ill.App.3d 1083, 424 N.E.2d 29 (1st Dist.1981).)

*Greylord cases.* Most of the evidence about fixed cases was presented by witnesses who had concocted the cases for the purpose of the Greylord investigation. Terrence Hake, an agent of the FBI posing as a corrupt lawyer, would represent the defendants in ghost-written cases. Agents would file complaints and testify about made-up events.

In one case two agents of the FBI, posing as "Norman Johnson" and "John Stavros," claimed to have had a violent encounter in which Johnson injured Stavros. Hake represented Johnson, the "defendant." Wearing a tape recorder, Hake privately visited Judge Murphy's chambers on the morning the case was set for a hearing. He introduced himself as Johnson's lawyer and said he wanted a verdict of not guilty. Murphy replied: "I'll throw the fucker out the window." Hake mentioned dealings with Joseph Trunzo and suggested that Trunzo would make arrangements; Murphy said: "That's okay, everything's alright." Murphy found Johnson not guilty. But things were not well. After the trial Hake gave $300 to Officer Joseph Trunzo ($200 for Murphy, $100 for Joseph and his twin brother Jim). They did not deliver the $200 to Murphy; they apparently planned to fleece Hake (a novice at corruption) by

keeping the money, leaving Hake to face an angry judge. Murphy told Hake the following week that he had not seen either Trunzo. A few days later Murphy visited traffic court, still the assignment of both Trunzos, looking for them. Joseph Trunzo then gave Murphy the $200 he had received from Hake, explaining to Murphy that "I got busy and forgot to call you." (In the other trials Joseph Trunzo kept Hake's money and Murphy did not get paid, but so far as the record shows Murphy did not know the money in these cases had been meant for him.)

Hake represented the "defendants" in several other cases fabricated by the FBI. The payoffs went more smoothly. On each occasion the "defendant" was discharged, and Hake paid Officer James LeFevour, apparently a more honest criminal than the brothers Trunzo. James LeFevour passed most of the money to Richard LeFevour and told Murphy that Judge LeFevour wanted verdicts of not guilty. Hake had some additional recorded ex parte conversations with Murphy. In one Hake conceded that his client was guilty but said he needed a verdict of not guilty; Murphy said "it'll be discharged that's all" and later acquitted the "defendant." During another meeting Murphy produced Hake's business card—a card given to James LeFevour on which Hake had written the names of cases he wanted dismissed. David Ries, another attorney and agent of the FBI, described two other concocted cases in which he represented "defendants" and paid a bribe through yet another police officer to obtain the desired disposition. See *United States v. Blackwood*, 768 F.2d 131 (7th Cir.1985), affirming that officer's conviction.

*The outcome.* The jury convicted Murphy on 24 of the 27 counts in the indictment. The counts involved four legal theories. Some counts charged violations of the mail fraud statute, 18 U.S.C. § 1341. The checks constituting the CBRs were mailed to the attorneys, and each mail fraud count was based on the mailing of one CBR. The "fraud" was one committed

by Murphy on the people of Cook County, who lost his honest services. Some counts were based on the Hobbs Act, 18 U.S.C. § 1951(a), which prohibits extortion affecting interstate commerce. The extortion lay in the solicitation and receipt of the bribes. Some counts were based on the theory that Murphy aided and abetted others who violated the Hobbs Act. The remaining count was based on the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), which prohibits the operation of an "enterprise" in interstate commerce through a "pattern" (two or more events) of "racketeering" (the violation of specified state or federal laws). The "enterprise" here was the Cook County Circuit Court.

The district court imposed 24 concurrent sentences. The longest, ten years, are based on the RICO and Hobbs Act counts. The court did not impose a fine or a forfeiture.

## II

Murphy attacks the convictions based on the Operation Greylord cases, which he depicts as frauds on the court. You cannot deprive the people of Cook County of honest services in such "cases," Murphy maintains, because they are not cases at all. The people had no right to any judicial services, honest or otherwise, in adjudicating put-up jobs, and so lost nothing from his conduct. He analogizes the situation to that of *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), in which the Second Circuit reversed a conviction when the Government had induced one party to place a phone call for the sole purpose of manufacturing the federal jurisdictional element of the crime.

*Archer* is a judicial reaction to activities the court thought overextended federal power. But this case is not *Archer*. The prosecutors did not move a state crime to a federal court by main force. Murphy's complaint is a more traditional objection to creative acts by prosecutors. He contends that there was no crime at all and that if

there was a crime the prosecutors manufactured it.

These arguments can be made about any "sting" operation—indeed about any use of undercover agents. The agents who offered bribes to Members of the House and Senate in the "Abscam" sting were not trying to grease the skids for a real project or obtain an actual law. Agents who buy illegal drugs are not going to distribute them for profit. There is no "crime" in these cases, in the sense that the scheme cannot come to fruition, and the evils against which the laws are set cannot occur. Yet courts regularly sustain convictions based on these entrepreneurial efforts. *E.g., United States v. Jannotti,* 673 F.2d 578 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *Baucom v. Martin,* 677 F.2d 1346 (11th Cir.1982) (Wood, J.). The law forbids the extortion and the scheme to defraud, not just the completed fraud. *United States v. Dial,* 757 F.2d 163 (7th Cir.1985); *United States v. Lindsey,* 736 F.2d 433, 436 (7th Cir.1984); *Jannotti, supra.*

In Operation Greylord agents of the FBI took the stand in the Circuit Court of Cook County and lied about their made-up cases. Perjury is a crime, and Murphy tells us that those who commit crimes themselves cannot prosecute others' crimes. But criminal proceedings are not designed to establish the relative equities among police and defendants. In many categories of cases it is necessary for the agents to commit acts that, standing by themselves, are criminal.

Bribery, like a wholesale transaction in drugs, is a secret act. Both parties to the bribe violate the law, just as both parties to the sale of drugs violate the law. It is commonplace for agents to take one side of a transaction in drugs. Because the crime leaves no complaining witness, active participation by the agents may be necessary to establish an effective case. The agents' acts merely *appear* criminal; they are not, because they are performed without the state of mind necessary to support a conviction.

The agents who made up and testified about the Operation Greylord "cases" did so without criminal intent. They were decoys, and the Greylord cases made it easier to separate the honest judges from the dishonest ones. It may be necessary to offer bait to trap a criminal. Corrupt judges will take the bait, and honest ones will refuse. Cases are the daily work of courts, just as laws and political deals are the daily work of legislators. In the Abscam operation, the Government offered legislators an opportunity suitable to their calling, and here the opportunity was suitable to the judges' calling.

True, as Murphy emphasizes, the phantom cases had no decent place in court. But it is no more decent to make up a phantom business deal and offer to bribe a Member of Congress. In the pursuit of crime the Government is not confined to behavior suitable for the drawing room. It may use decoys, *Lewis v. United States*, 385 U.S. 206, 208–09, 87 S.Ct. 424, 425–26, 17 L.Ed.2d 312 (1966), and provide the essential tools of the offense, see *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). The creation of opportunities for crime is nasty but necessary business. See *United States v. Belzer*, 743 F.2d 1213, 1219 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 788, 83 L.Ed.2d 781 (1985); *United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir.1983). The Government offered Murphy opportunities to sell the powers of his office and disgrace himself. He accepted with alacrity.[1]

▮▮ The FBI and the prosecutors behaved honorably in establishing and running Operation Greylord. They assure us that they notified the Presiding Judge of the Circuit Court's Criminal Division, the State's Attorney of Cook County, the Attorney General of Illinois, and the Governor of Illinois. Such notice may not be

necessary, and certainly a criminal defendant is in no position to complain of the absence of such notice (for he has no personal right to protect the dignity of the Cook County courts), but the notice dispels any argument that the federal Government has offended some principle requiring respect of the internal operations of the state courts. The Greylord cases did not interfere with the smooth operation of the local courts or diminish the rights of any third party. They were, in this respect, less offensive than "sting" operations in which the police go into business as a "fence" for stolen goods. The existence of a well-paying fence may induce people to steal goods to sell to the fence. Here no stranger was at risk. Operation Greylord harmed only the corrupt.

### III

Murphy raises six issues concerning the interpretation or application of the statutes under which he was convicted.

1. The mail fraud counts were based on the mailings of the CBRs. Murphy says that these mailings were not part of any fraud committed against the people of Cook County. The CBRs were matters between the clients and the lawyers; he had nothing to do with them. He relies on *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), and *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). In each of these cases the Court held that mailings that merely settle accounts among the victims after the fraud had taken place do not bring the fraud within the mail fraud statute.

▮▮ The jury was entitled to conclude, however, that the mailings of the CBRs were integral to the offense. Murphy received payoffs. Lawyers paid the bribes in order to secure their own profits, and those profits came by way of the CBRs. In the morning the lawyers would fix cases (or hustle clients), and Murphy would release

---

1. Murphy argues fleetingly that he is a victim of selective prosecution. He does not even try to fit his case within the stringent criteria of *Wayte*

*v. United States,* —— U.S. ——, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). The argument is a makeweight.

the CBRs to the lawyers. In the afternoon the lawyers would pay the judge for services rendered. The next day the process would be repeated. In *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), a scheme under which the defendant induced his spouse to send money through the mail, the defendant absconded with the loot, which the Court held violated the mail fraud statute. The mails carried the money to be used in the offense. Here it was the anticipation of receiving the CBRs in a given case (and future cases) that both financed the bribes and made the scheme profitable.

■ It may be that Murphy did not care whether the lawyers picked up checks in person or whether the court sent them out by messenger instead of mail. But the statute does not demand that the mail (as opposed to some other form of delivery) be essential to the offense. It is enough if use of the mail is an ordinary or expectable event in the course of the scheme and the mailings further the scheme. *United States v. Lea*, 618 F.2d 426, 430 (7th Cir.), *cert. denied*, 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). See also *United States v. Lindsey*, 736 F.2d 433, 437 (7th Cir.1984); *United States v. Cavale*, 688 F.2d 1098 (7th Cir.), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 380, 74 L.Ed.2d 513 (1982); *United States v. Galloway*, 664 F.2d 161, 163–64 (7th Cir.1981), *cert. denied*, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). Murphy caused the mailings to occur, which furthered the scheme. See *Lea, supra*, 618 F.2d at 430.

■ Murphy also appears to argue that the mail fraud statute does not apply to a case in which the fraud is deceit that deprives the people of the honest services of public officials. *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), *cert. denied sub nom. Kerner v. United States*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), rejects this argument, and we see no reason to revisit *Isaacs*. See also *United States v. Brack*, 747 F.2d 1142, 1146 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985) (mail

fraud statute not confined to technical reading of "fraud"); *United States v. Gorny*, 732 F.2d 597, 602 n. 2 (7th Cir.1984).

■ 2. The indictment alleged that Murphy's receipt of bribes was extortion under the Hobbs Act. The instruction told the jury, over Murphy's objection, that receipt of bribes is sufficient to establish the offense. Murphy argues that the Hobbs Act requires solicitation of bribes, not just the receipt of them. But the instruction was in line with the law of this circuit. See, *e.g., United States v. Schmidt*, 760 F.2d 828, 832 (7th Cir.1985) (collecting cases). Murphy relies on *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (en banc), which he says holds that a demand for payment in exchange for a specific return is an element of every Hobbs Act prosecution. As we explained in *Schmidt*, the holding of *O'Grady* is not so broad. It requires only a misuse of office in exchange for a payoff, not a specific demand for payment on threat of a specific sanction. *O'Grady* would not help Murphy even if this circuit followed that case. The instructions here called for the jury to find misuse of office.

■ 3. The Hobbs Act requires proof of an effect on interstate commerce. The indictment alleged, and the evidence showed, that the bribes paid to Murphy "depleted the assets" of the lawyers who paid them, and that the lawyers regularly purchased items in interstate commerce. The proof at trial showed, for example, that Arthur Cirignani's law firm regularly purchased law books from out of state. Terrence Hake purchased envelopes and stationery from New York. This and other evidence showed a regular connection between the lawyers and interstate commerce. Cf. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 783–86, 95 S.Ct. 2004, 2011–13, 44 L.Ed.2d 572 (1975). The evidence is thin, and as an original matter we might be inclined to doubt that the "depletion" of the lawyers' assets had much effect on commerce. The commerce power of Congress is sweeping, however, and this court has held that Congress meant to ex-

ercise that power to the limit. *United States v. Staszcuk*, 517 F.2d 53, 58–59 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). The statute reaches those who affect commerce "in any degree," and in a complex economy almost any movement of funds affects commerce to some degree.

█ The commerce power reaches everything related to commerce, even though particular instances of a class of activities do not themselves occur in or affect commerce. *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); cf. *Russell v. United States*, — U.S. —, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985). We have therefore sustained prosecutions based on the "depletion of assets" theory, at least when the assets depleted are those of a business. See *e.g., United States v. Boulahanis*, 677 F.2d 586, 589–90 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. Blakey*, 607 F.2d 779, 784 (7th Cir.1979). See also *United States v. Curcio*, 759 F.2d 237, 241–42 (2d Cir.1985); *United States v. Rindone*, 631 F.2d 491, 493–94 (7th Cir. 1980). The lawyers and law firms here are businesses. The evidence establishing the interstate commerce element of the Hobbs Act offense is skimpy, but even a small effect touches commerce "in any degree" and so is adequate under these cases.

█ 4. It is easier to establish the commerce element of the RICO count. Only the "enterprise" need affect commerce. *United States v. Dickens*, 695 F.2d 765, 781 (3d Cir.), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983). Cf. *United States v. McManigal*, 708 F.2d 276, 283 (7th Cir.), *vacated on other grounds*, — U.S. —, 104 S.Ct. 419, 78 L.Ed.2d 355 (1983) (sufficient if the clients of the enterprise "do interstate business"). The "enterprise" here was the Circuit Court of Cook County. See *United States v. Lee Stoller Enterprises, Inc.*, 652 F.2d 1313 (7th Cir.) (en banc), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 615 (1981) (a county sheriff's office may be an enterprise under RICO). Without question

the evidence showed that the Circuit Court affected commerce—in what it bought in order to operate, in its effect on the lawyers and litigants who appeared before it. If the enterprise of being a real estate broker affects commerce because clients may move from state to state, see *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), then the enterprise of being a large metropolitan court does so.

█ 5. RICO makes unlawful the participation in a "pattern" of "racketeering activity" conducted through an "enterprise." "Racketeering activity" includes "any act or threat involving ... bribery ... which is chargeable under State law and punishable by imprisonment for more than one year" (18 U.S.C. § 1961(1)(A)). The RICO count in this case alleged that Murphy conspired with others to violate RICO and committed 13 identified violations of Ill.Rev.Stat., ch. 38, §§ 33–1 and 33–3(d), which make bribery punishable by imprisonment for more than one year. Murphy argues that the indictment is defective because it does not show that he has been convicted of these violations of state law. But RICO does not require conviction; it requires only that the act be "chargeable" —that is, that the predicate act be a criminal rather than civil offense. The Supreme Court held in *Sedima, S.P.R.L. v. Imrex Co.*, — U.S. —, —, 105 S.Ct. 3275, 3280, 87 L.Ed.2d 346 (1985), that the statute does not require a prior conviction. *Sedima* disposes of Murphy's argument.

6. Three counts of the indictment alleged that Murphy aided and abetted James LeFevour "and another judge" (obviously Richard LeFevour) to obtain extortionate payments. Murphy asked for, and the district court refused to give, an instruction that the jury could not convict him of aiding and abetting if it believed that the LeFevours were "incapable of committing the charged acts." There can be no aiding and abetting without an underlying offense. But Murphy never offered the district court a theory under which the LeFevours might be "incapable"

of committing the offense of extortion. At oral argument counsel for Murphy elaborated by saying that someone needed to defend Richard LeFevour's interests, and the instruction would have helped. The argument, in other words, is that charges of aiding and abetting ought to be tried at the same time as the charges against the principals.

There is no such rule of mandatory joinder. To the contrary, it is possible to convict a person of aiding and abetting even after the principal has been tried and acquitted. *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). The district court properly charged the jury that it could convict only if it first determined that there was an underlying offense and that Murphy aided and abetted the offenders. Murphy was entitled to no more.

## IV

This was a long and complicated trial. Like many another long and complicated trial, it has produced a volume of claims of error. None of the claims is persuasive.

1. Several of the witnesses for the prosecution—particularly James LeFevour and Arthur Cirignani—had arrangements reducing their exposure to criminal liability. The Government undertook to prosecute LeFevour only on three tax counts; it promised not to prosecute Cirignani at all if he cooperated fully and told the truth. These arrangements were disclosed on the record, as *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), requires. Murphy nonetheless maintains that the testimony should not have been admitted, because the prosecution did not grant these witnesses immunity under 18 U.S.C. §§ 6002 and 6003, or at least should have been the subject of an instruction to the jury that "informal immunity" is unlawful.

Murphy misunderstands the function of immunity. The self-incrimination clause of the fifth amendment provides that no person may be compelled to be a witness against himself in a criminal case. If the answer to a question tends to incriminate a witness, that person has a privilege not to reply. Immunity from prosecution under §§ 6002 and 6003 removes the possibility of punishment on account of truthful testimony; with the possibility of incrimination removed, the privilege vanishes. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). If the prosecutor wants to *compel* a witness to testify, he must use §§ 6002 and 6003. *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 1243–44, 79 L.Ed.2d 552 (1984); cf. *Pillsbury Co. v. Conboy,* 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983).

Nothing requires a witness to assert the privilege, however. The witness may surrender the privilege even by neglecting to invoke it, see *Garner v. United States,* 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976). Because the privilege bars only testimonial compulsion, voluntary arrangements that produce testimony are permissible. A witness may agree to testify on any terms satisfactory to himself. If James LeFevour or Arthur Cirignani had invoked the privilege, the United States could have overcome the claim only by resorting to formal immunity. But Murphy could not compel either witness to assert the privilege, and therefore he has no complaint when they decide to testify in exchange for less formal protection from prosecution. See *United States v. Dailey,* 759 F.2d 192 (1st Cir.1985) (witness may testify even under a contingent immunity). Because Murphy has no interest in the degree of assurance the witnesses received, there was no reason for the judge to instruct the jury (as Murphy had requested) on the difference between formal and informal assurances of immunity. The jury was entitled to know what assurances the witnesses received, but it need not be told the fine-spun legal distinctions underlying different kinds of assurances.

2. James LeFevour did not testify before the grand jury that indicted Murphy. Indeed, according to the prosecutors he did not begin to cooperate until several weeks

before the start of Murphy's trial. He was interviewed only by prosecutors, and their notes of the interviews are not "substantially verbatim" statements of LeFevour. The Government therefore informed Murphy that it had no materials meeting the requirements of the Jencks Act, 18 U.S.C. § 3500. (Nonetheless, three weeks before trial the Government gave Murphy a letter outlining the expected contents of James LeFevour's testimony. This averted surprise at trial.)

▇ Murphy does not say that the prosecution neglected to turn over any "written statement" or "substantially verbatim recital of an oral statement," the key phrases in the Jencks Act. See 18 U.S.C. § 3500(e)(1) and (2). He apparently maintains that the prosecution was required to create Jencks material for the defense to use. We know of no support for imposing such an obligation on the prosecution. The Jencks Act allows the defendant access to the same statements the prosecutor has. If there are no such statements, there are no such statements. The prosecution does not have an obligation to generate statements merely because the defendants would like to have them. *United States v. Flomenhoft*, 714 F.2d 708, 713 (7th Cir. 1983), *cert. denied*, — U.S. —, 104 S.Ct. 1420, 79 L.Ed.2d 745 (1984).

▇ 3. Although James LeFevour did not testify before the grand jury, an agent of the FBI relayed to the grand jurors who returned a superceding indictment the information to which the prosecutors expected LeFevour to testify. Murphy sought this testimony as a form of substitute Jencks material. But the agent did not testify at trial, and the Jencks Act therefore is inapplicable. It applies only to statements of the "witness," § 3500(a), and then only after the witness has testified. There can be no plausible argument that what the agent said is a "written statement" of James LeFevour, a "substantial verbatim" report of an oral statement of LeFevour's, or a "statement ... if any, made by said witness to a grand jury" (see § 3500(e)(3)).

▇ 4. Murphy replies that if this is so, then the indictment must be void. What else could support the charges? There are two answers. One is that James LeFevour was hardly the only source of evidence against Murphy. The other is that an indictment may be founded on hearsay—even entirely on hearsay, as in *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). "[A]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits." 350 U.S. at 363, 76 S.Ct. at 408 (note omitted). See also *United States v. Calandra*, 414 U.S. 338, 344–45, 94 S.Ct. 613, 618–19, 38 L.Ed.2d 561 (1974); *United States v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958).

We recognize that some of the lower courts have balked at the result of this line of cases. In *United States v. Estepa*, 471 F.2d 1132 (2d Cir.1972), for example, the court dismissed an indictment supported only by hearsay when the witnesses misled the grand jury about the quality of the evidence it was hearing. *United States v. Mechanik*, 756 F.2d 994 (4th Cir.1985) (en banc), *cert. granted*, — U.S. —, 105 S.Ct. 3476, 85 L.Ed.2d — (1985), establishes a rule of per se reversal for certain procedural violations occurring before the grand jury. Other cases are summarized in Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 15.4(b) (1985). The foundation of these cases is shaky at best in light of the Supreme Court's decisions, as the grant of review in *Mechanik* may suggest. The Court expressed concern in *Costello* and *Calandra* that challenges to the sufficiency of the evidence and other process before the grand jury would greatly slow down criminal litigation, to the detriment of the public's interest in expeditious resolution of criminal charges. Cases inquiring into the procedures before the grand jury may have had just that effect in some courts. But however that may be,

Murphy does not argue that the prosecution misled the grand jury about the quality of the evidence it was hearing.

The conclusion that a court will not inquire into the quality or sufficiency of the evidence underlying the indictment is especially powerful when the review comes after trial. The indictment establishes a prima facie case and marks the battleground for the trial. Once a jury has determined guilt beyond a reasonable doubt, there is no good reason to inquire into the sufficiency of the evidence that went before. We know that the defendant has not been required needlessly to bear the expense and embarrassment of trial. "Any possible prejudice to the defendant ... disappears when a constitutionally valid trial jury later finds him guilty beyond a reasonable doubt." *Rose v. Mitchell*, 443 U.S. 545, 575, 99 S.Ct. 2993, 3010, 61 L.Ed.2d 739 (1979) (Stewart, J., concurring).[2] This post-trial challenge to the sufficiency of the evidence supporting the indictment asks us to undertake an entirely pointless inquiry. We decline.

5. Judge Thaddeus Kowalski testified, as we recounted in Part I, that he tried to put a stop to hustling at Branch 29. His reward was a transfer to a lesser court and replacement by Murphy. During the final argument the U.S. Attorney stated: "Judge Kowalski said that [he was transferred for resisting hustling]—what motivation would Judge Kowalski have to come in here and lie? He is testifying about a fellow judge. Why would he come in here and lie unless the point is that he came in here because he had relevant information? He was subpoenaed to testify and he told the truth."

The last sentence of this statement was inappropriate. A prosecutor may not vouch for the honesty of a witness. *United States v. Young*, —— U.S. ——, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); ABA Code of Professional Responsibility, DR 7–106(C)(3) and (4). Murphy's counsel did not object to this statement, however, and we doubt that the court's failure to give a cautionary instruction on its own motion can be deemed "plain error" under Fed.R.Crim.P. 52(b). See *United States v. Young, supra,* 105 S.Ct. at 1046–47. Any error, moreover, was harmless. The U.S. Attorney did not argue the point at length or imply that he possessed additional evidence not before the jury. Kowalski was a peripheral figure in a lengthy trial. This error did not "affect substantial rights" and therefore "shall be disregarded." Fed. R.Crim.P. 52(a). See *United States v. Young, supra; United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

6. Murphy challenges the admission of several kinds of evidence. Much of the evidence about the traffic court concerns unidentified cases. When James LeFevour was asked by Murphy's counsel to name "just one" particular case, he said he could not; when asked in what year he handed bribes to Murphy at traffic court, he said "between '75 and the end of '80." Murphy's counsel quips: "Clarence Darrow couldn't defend against that, and he wouldn't have been asked to."

The traffic court evidence was pertinent to the RICO conspiracy count. The behavior at traffic court established overt acts of the conspiracy. All of the substantive charges in the indictment charged bribes paid on identified days to identified people during Murphy's years at Branch

---

**2.** The majority in *Rose* held that when the indictment is returned by a racially biased grand jury, the indictment must be dismissed. It did this because "discrimination on the basis of race in the selection of members of a grand jury ... strikes at the fundamental values of our judicial system and our society as a whole." 443 U.S. at 556, 99 S.Ct. at 3000. In other words, although for the reasons explained by Justice Stewart an error at the grand jury stage does not harm a

particular defendant once he has been convicted at trial, it is sometimes necessary to allow a defendant to vindicate broader social interests. There is no similarly broad social interest in preventing the use of hearsay evidence before grand juries. Cf. *Hillery v. Pulley*, 733 F.2d 644 (9th Cir.1984), *cert. granted sub nom. Vasquez v. Hillery*, —— U.S. ——, 105 S.Ct. 1390, 84 L.Ed.2d 780 (1985), which presents another aspect of the issue in *Rose.*

29. It is therefore immaterial that Murphy could not defend against a particular allegation of bribery during the traffic court years; he was not on trial for those offenses. It was permissible for the Government to introduce evidence tending to establish the existence of the RICO offense, even though none of the traffic court evidence itself could have been the foundation of a conviction. See *United States v. Angelilli*, 660 F.2d 23, 39–40 (2d Cir.1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982). The evidence was certainly relevant under Fed.R.Evid. 401. Murphy does not say that he had trouble telling one bribe from another; he denies that he took even one. The imprecision in James LeFevour's recall of dates and cases therefore worked to Murphy's advantage by weakening the prosecution's case without undercutting his own.

 Several witnesses testified that Murphy had a reputation for dishonesty. This was permissible. Murphy's character and reputation were in controversy in this case. He put on a parade of character witnesses, and the prosecution was entitled to counter that evidence. Fed.R.Evid. 404(a)(1), 405(a). The prosecutor's right to introduce particular acts to show a common plan and absence of mistake—Murphy denied that the money was for bribes, if it was received at all—also supports the "anonymous case" evidence. Fed.R.Evid. 404(b). Surely it is significant that Murphy had been receiving envelopes full of cash month after month for eight years; a jury was entitled to infer that these envelopes were payments for *something*.

 The participants in conversations in Judge Murphy's chambers often commented on how they interpreted his remarks. For example, Cirignani testified that when he visited Murphy's chambers to discuss the motion for suppression of evidence in *People v. Best* and told Judge Murphy that he wanted the Judge to grant the motion, Murphy replied: "I'll take a look at it." Cirignani testified over objection that he interpreted this remark "to mean that he would, in fact, suppress the

evidence and rule in my favor." This evidence was relevant; the Hobbs Act requires a showing that the victim paid money because of the other party's official position. The prosecutor needed to show that Cirignani paid because Murphy was willing to alter his official acts. Cirignani was an experienced participant in the process, and the jury was entitled to hear his deductions about what signals had been sent and received. Bribes can be arranged in code and with body movements; even grizzled participants may be cagy. Cirignani's testimony about the meaning of a conversation among business partners was admissible. *United States v. Craig*, 573 F.2d 513, 520 (7th Cir.), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978).

 7. Despite Murphy's protests, the district judge conducted the conference about the instructions to the jury in his chambers and off the record. The conference lasted some five hours. Counsel maintain that they could not adequately remember what happened in order to preserve their objections. Murphy argues that the unrecorded conference violated 28 U.S.C. § 753(b), which says that "[e]very session of the court and every other proceeding designated by rule or order of the court ... shall be recorded verbatim...." But Murphy overlooks the rest of the section: "Proceedings to be recorded under this section include (1) all proceedings in criminal cases had in open court...." The statute does not require the conference on jury instructions to be held in open court.

Criminal trials are formal proceedings. The formality is important. It preserves regularity; it protects the dignity and orderliness of what could otherwise deteriorate in light of the nature of the charges and the low-life status of many defendants and witnesses. The requirement that most of what happens happen in open court also is important. The jury must hear what transpires. The defendant is entitled under the Sixth Amendment to be present and have a public trial, and the public has rights under the First. Yet not everything requires the same degree of formality.

The jury is supposed not to hear the debates about the instructions. Both defendant and the public will learn how things came out no later than the jury does. The defendant may have a right to attend the conference in chambers or in court. A district judge is entitled to conclude that a long and complex trial such as this one has formality enough, and that both the judge and the lawyers would benefit from the lower level of tension that flows from holding a conference in chambers without official recording.

The Fifth Circuit has held that a judge may elect to have the instruction conference in chambers without a court reporter, if the local rules so permit. *United States v. Jenkins*, 442 F.2d 429, 438 (5th Cir.1971). We concur. At the conclusion of the conference the judge must make formal rulings on the record and offer counsel an opportunity to make their objections known. The court did so here, and this is sufficient to protect the rights of the accused.

It is possible that this procedure could injure the defense if it obscured the nature of the objections made and reasons for giving the instructions. For example, the defendant might have proposed in writing an incorrect instruction and then modified the proposal orally during the conference. If the judge refused to give the instruction, it may be difficult to tell what modifications were proposed and whether the instruction, as modified, would have been appropriate. We therefore think it necessary for an appellate court, when reviewing a trial in which the instruction conference was not transcribed, to indulge all reasonable inferences favorable to the defendant.

We have done so in this case. We considered in Part III all of Murphy's statutory arguments, despite the Government's contentions that some of Murphy's own draft instructions were flawed and his objections imperfect. We should greatly regret it if some day it is necessary to set aside a conviction because we cannot tell whether objections were adequately pre-

served and must indulge inferences. But we see no adequate reason to command recordation in every case and no other way to proceed if we do not.

8. There are a few more arguments to consider, but most concern the scope of cross-examination allowed to defense counsel. The district court cut off inquiry into Greylord matters other than the five cases presented at this trial. The management of cross-examination is peculiarly committed to the district court's discretion, *United States v. Muelbl*, 739 F.2d 1175, 1184–85 (7th Cir.), *cert. denied,* ── U.S. ──, 105 S.Ct. 388, 83 L.Ed.2d 322 (1984), and the court did not abuse that discretion in declining to allow defense counsel to wander afield.

All told, this case was well tried by counsel and well handled by the court. No case of this complexity will be without flaw. This one came reasonably close.

V

This leaves for consideration the most difficult and troubling question: whether the district judge was required to recuse himself.

The principal lawyer for the United States at trial was Dan K. Webb, then the U.S. Attorney. Webb and Judge Kocoras are the best of friends. They met when both were Assistant United States Attorneys in Chicago between 1971 and 1975. Judge Kocoras stated that "our professional relationship developed into a social friendship as well." Immediately after Judge Kocoras sentenced Murphy on August 8, 1984, Judge Kocoras, Dan Webb, and the Kocoras and Webb families repaired to the Calloway Gardens Resort, Pine Mountain, Georgia. They resided there in adjoining cottages. The trip had been planned before the trial, and Judge Kocoras advanced the date of sentencing so that he could wrap up the Murphy case before going on vacation with the Webb family. This was not an isolated event. The Webbs and Kocorases had vacationed together at Calloway Gardens in 1982.

Counsel for Murphy learned of the 1984 vacation for the first time after Judge Kocoras had sentenced Murphy. In February 1985 counsel filed a motion seeking Judge Kocoras's recusal under 28 U.S.C. § 455(a), which provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." See also Canon 3(C)(1) of the Code of Judicial Conduct. Judge Kocoras denied the motion.

Neither the close friendship between Kocoras and Webb nor either of the vacations was disclosed on the record. Yet the statute places on the judge a personal duty to disclose on the record any circumstances that may give rise to a reasonable question about his impartiality. Although a judge may accept a waiver of disqualification under § 455(a), the "waiver may be accepted [only if] it is preceded by a full disclosure on the record of the basis of the disqualification." 28 U.S.C. § 455(e).

■■■■ Murphy contends that the vacation plans give rise to a reasonable question about any judge's ability to remain impartial. No one doubts that Judge Kocoras was in fact impartial; his reputation for integrity and impartiality is outstanding. Yet the statutory test is not actual impartiality but the existence of a reasonable question about impartiality. When a question arises about friendship between a judge and a lawyer, "[t]he twofold test is whether the judge feels capable of disregarding the relationship and whether others can reasonably be expected to believe that the relationship is disregarded." Advisory Opinion No. 11, Interim Advisory Committee on Judicial Activities (1970).

■■■■ The statutory standard puts to the judge a question about the objective state of the legal and lay culture. The court must consider whether an astute observer in either culture would conclude that the relation between judge and lawyer (a) is very much out of the ordinary course, and (b) presents a potential for actual impropriety if the worst implications are realized. The inquiry is entirely objective, see *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460–461 (7th Cir.1985), and is divorced from questions about actual impropriety.

■■■■ The existence of a "reasonable question" varies from time to time as ordinary conduct of lawyers and judges changes. When John Marshall was the Chief Justice, the Justices and many of the lawyers who practiced in the Supreme Court lived in the same boarding house and took their meals together. Washington, D.C., was still a small town and neither justices nor counsel lived there year-round. See G. Edward White, *The Working Life of the Marshall Court, 1815–1835*, 70 Va.L. Rev. 1 (1984). It is accepted today for a judge in the United Kingdom to hear a case in which his sibling or child is an advocate. The ordinary standards of conduct of the legal profession reflect judgments about the likelihood of actual impropriety in a particular case. Unless the conduct is substantially out of the ordinary, it is unnecessary to pursue the further question whether the conduct presents the appearance of impropriety—although it is always possible to inquire into actual impropriety no matter how common the conduct may be.

In today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. A judge need not cut himself off from the rest of the legal community. Social as well as official communications among judges and lawyers may improve the quality of legal decisions. Social interactions also make service on the bench, quite isolated as a rule, more tolerable to judges. Many well-qualified people would hesitate to become judges if they knew that wearing the robe meant either discharging one's friends or risking disqualification in substantial numbers of cases. Many courts therefore have held that a judge need not disqualify himself just because a friend—even a close friend—appears as a lawyer. *E.g., In re United States*, 666 F.2d 690 (1st Cir.1981); *Parrish v. Board of Commissioners*, 524 F.2d 98 (5th Cir. 1975) (en banc). Cf. *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 680 (7th

Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983).

These cases also suggest, however, that when the association exceeds "what might reasonably be expected" in light of the associational activities of an ordinary judge (*Parrish, supra,* 524 F.2d at 104), the unusual aspects of a social relation may give rise to a reasonable question about the judge's impartiality. The relation between Judge Kocoras and U.S. Attorney Webb was unusual. These close friends had made arrangements before the trial began to go off to a vacation hideaway immediately after sentencing.

Most people would be greatly surprised to learn that the judge and the prosecutor in a trial of political corruption had secret plans to take a joint vacation immediately after trial. An objective observer "might wonder whether the judge could decide the case with the requisite aloofness and disinterest" (*Pepsico, supra,* 461). The test for an appearance of partiality in this circuit is "whether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case" (*id.* at 460). That hypothetical observer would be troubled by what happened in this case.

This is not an occasion on which to lay down rules for the permissible extent of social ties between judge and counsel. Social relations take so many forms that it would be imprudent to gauge all by a single test. We decide only the case before us. But with appreciation for both the difficulty of deciding how much is too much, and deference to the contrary judgment of a careful and upright judge, we conclude that an objective observer reasonably would doubt the ability of a judge to act with utter disinterest and aloofness when he was such a close friend of the prosecutor that the families of both were just about to take a joint vacation. A social relation of this sort implies extensive personal contacts between judge and prosecutor, perhaps a special willingness of the judge to accept and rely on the prosecutor's representations. The U.S. Attorney lays his own prestige, and that of his office, on the line in a special way when he elects to try a case himself. By acting as trial counsel he indicates the importance of the case and of a conviction, along with his belief in the strength of the Government's case. It is a particular blow for the U.S. Attorney personally to try a highly visible case such as this and lose. A judge could be concerned about handing his friend a galling defeat on the eve of a joint vacation. A defendant especially might perceive partiality on learning of such close ties between prosecutor and judge.

Yet this conclusion does not lead to a decision in Murphy's favor. Although perhaps 999 of 1000 observers would have been stunned to discover that judge and prosecutor were about to go on a joint vacation, the remaining one of the thousand was on Murphy's defense team. Matthias Lydon, the principal trial lawyer for Murphy, had been in the U.S. Attorney's office at the same time as Dan Webb and Judge Kocoras. Lydon and Webb later were partners in private practice. All three were friends and remained so. Judge Kocoras stated that "my professional relationship with [Lydon] developed into a social friendship as well, and no less than that with Mr. Webb. Those friendships developed [at the U.S. Attorney's office] and continue to the present day." The vacation at Calloway Gardens Resort in 1982 had included Lydon and his family as well as the Webb and Kocoras families. Although Lydon has filed an affidavit stating that he did not know of the plans for the 1984 vacation, he admitted that he knew of the close relation between Webb and Kocoras and did not deny the probability of future vacations at what is apparently the favorite resort of former members of the U.S. Attorney's office in Chicago. Murphy himself filed an affidavit conceding that he knew that Lydon, Webb, and Judge Kocoras are close friends, although Murphy denied knowledge of both vacations.

Lydon's friendship with Judge Kocoras removes some of the sting from the revelation about the vacation plans of the judge and the prosecutor. The defense camp's knowledge did not abrogate any obligation to spread the information on the record and seek Murphy's consent to his participation in the case, however. Section 455(e) requires waiver on the record, not waiver by implication. *Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1114 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). This court said in *SCA Services, Inc. v. Morgan,* 557 F.2d 110, 117–18 (7th Cir.1977), that there is no time limit on a motion for recusal. The principal disqualification statute in effect before § 455 was amended in 1974 had contained a time limit for motions, and the Department of Justice asked Congress to put such a limit in the new § 455 as well. Congress did not, and the court concluded in *Morgan* that this implies the absence of a time limit.

Our decision stands alone, however. The Fifth Circuit has called the discussion in *Morgan* dicta and rejected the conclusion on the merits, reasoning that Congress did not put a time limit in § 455 because time limits were already so firmly fixed in both statute and common law that there was no need to add another. *Delesdernier v. Porterie,* 666 F.2d 116, 120–23 & n. 3 (5th Cir.), *cert. denied,* 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982). See also *Oglala Sioux Tribe v. Homestake Mining Co.,* 722 F.2d 1407, 1414 (8th Cir.1983); *United States v. Slay,* 714 F.2d 1093 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984); *United States v. Nobel,* 696 F.2d 231 (3d Cir.1982), *cert. denied,* 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983); *United States v. Hines,* 696 F.2d 722, 729 (10th Cir.1982); Comment, *Disqualification of Federal Judges for Bias or Prejudice,* 46 U.Chi.L. Rev. 236, 263–64 (1978).

We need not decide whether to reconsider *Morgan* in light of *Delesdernier* and the cases that have followed *Delesdernier.* It would be difficult to find a "waiver" on this record because neither Murphy nor Lydon knew before sentencing of the vacation plans the only source of the appearance of impropriety. We believe, however, that the absence of a waiver is not dispositive. The question here is not really whether Judge Kocoras was required to recuse himself when Murphy filed his motion. Judge Kocoras already had imposed sentence; there were no further proceedings from which Judge Kocoras could be recused. What Murphy wants is not recusal from future proceedings but the nullification of everything that went before. We conclude that this is not the appropriate consequence of a recusal for appearance of impropriety.

In cases decided under § 455(a), disqualification runs from the time the motion was made or granted. In *Pepsico,* our most recent case under § 455(a), the court ordered the district judge to stand aside from the time a party filed the motion for recusal; we did not vacate all of the judge's earlier orders and require the new judge to start afresh. Our research has not turned up any case involving mere appearance of impropriety in which the court set aside decisions that had been taken by the district judge before any party asked for recusal.[3]

The statute requiring recusal when the judge's impartiality might reasonably be questioned vindicates interests of the judicial system as a whole. It is important to the administration of justice that judges both be and appear to be impartial. When a question about impartiality reasonably arises, the judge must stand aside in

---

3. *Hall v. SBA,* 695 F.2d 175 (5th Cir.1983), comes the closest. In *Hall* a magistrate's law clerk accepted employment with the plaintiff's law firm and thereafter worked on the magistrate's opinion. The clerk also had been a member of the plaintiff class. The court thought this required the magistrate's opinion to be set aside, although no motion was made until after the opinion was released. We think that *Hall* is best understood as a case of actual bias (of the clerk) imputed to the court, not simply as an "appearance" case.

order to preserve public confidence in the courts. But this does not imply that a judge who is a close friend of counsel will provide an unjust disposition; if it implied that, the question would be one of actual impropriety rather than the "appearance" of impropriety. No one thinks that Chief Justice Marshall acted with actual impropriety when he heard arguments from lawyers with whom he shared a boarding house. The rule of § 455(a) is designed to put an extra measure of safety into the system. When that extra measure fails, the result is regrettable, and the judicial system as a whole suffers, but this does not mean that the parties actually received an unjust trial.

■ The waiver provision of § 455(e), which applies to the "appearance" of impropriety issues under § 455(a) but not to any actual conflict of interest under § 455(b), reinforces our conclusion that § 455(a) is concerned with perceptions rather than actual defects in the administration of justice. Under § 455(a) and (e) a party may stand on his right to a judge about whom no reasonable question may be asked; yet the possibility of waiver implies that the judge can provide a fair trial even if such questions may be asked. Section 455(e) gives a party an absolute right to remove a judge (by declining to waive), but it necessarily implies that conduct after a waiver (and therefore before one, too) does not automatically deprive the party of substantial *personal* rights. The many cases in other circuits holding that "appearance" questions are waived if not timely asserted—so the judge may continue to sit even *after* the motion—also show that appearance of impropriety does not undercut personal rights. And unless an error affects substantial rights, it is not a basis of reversal. 28 U.S.C. § 2111; Fed.R.Crim.P. 52(a).

■ It is important in criminal cases especially to induce defendants to present their claims in a timely fashion. A battery of rules—from contemporaneous objection rules to forfeiture rules such as Fed.R. Crim.P. 12(f)—requires defendants to present claims while there is still time to eliminate the problem and avoid a needless trial. If they fail to do so, the claim is forfeit. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). Forfeiture may occur even in the absence of an explicit time limitation if the right is knowable in advance and exercise of the right would prevent repetitious litigation. *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); Peter Westen, *Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure,* 75 Mich.L.Rev. 1214, 1254– 59 (1977). Only if the accused could not have known of the right, see *Reed v. Ross,* — U.S. ——, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984), or some other "cause" impedes a defendant from standing on his rights, see *Riner v. Owens,* 764 F.2d 1253 (7th Cir. 1985), will a court permit the defendant to have two trials when a timely assertion of the right would have held the number to one.

■ Certainly a request for recusal before trial would have avoided any possibility of retrial. Murphy might have given a formal waiver on the record; Judge Kocoras might have recused himself; U.S. Attorney Webb might have stepped aside and allowed the case to be tried by a member of his office. Murphy had all the information he needed to initiate inquiry. Although according to the affidavits of Lydon and Murphy the defense camp did not know of the vacation plans for 1984, Lydon knew of the actual vacation in 1982, and Murphy knew of the longstanding friendship among Lydon, Webb, and Judge Kocoras. This was more than enough to put a reasonable person on notice of the potential gains from further inquiry. The defense camp elected not to make any further inquiry, perhaps believing that an ethical judge such as Judge Kocoras would bend over backward to avoid favoring the prosecutor in such a case and that the defense therefore had more to gain from the Kocoras-Lydon friendship than it had to lose from the Kocoras-Webb friendship. The defendant

is bound by a tactical choice such as this may have been, whether or not he participated personally in that choice. *Jones v. Barnes,* 463 U.S. 745, 751–54, 103 S.Ct. 3308, 3312–14, 77 L.Ed.2d 987 (1983); cf. *Wainwright v. Sykes* and other forfeiture cases.

■ Ultimately, however, we do not rest on the fact that Lydon, Webb, and Judge Kocoras went on vacation together in 1982. A detailed inquiry into what the defense camp knew and when is not essential when the motion under § 455(a) is filed as late as this was. A criminal trial is too serious and too costly to permit a defendant to sit on possible errors, hoping to have a crack at an acquittal (or low sentence) and then still a second trial. If a defendant wants a judge to stand aside under § 455(a), he must make the appropriate motion. Judicial acts taken before the motion may not later be set aside unless the litigant shows actual impropriety or actual prejudice; appearance of impropriety is not enough to poison the prior acts. See *Margoles v. Johns,* 660 F.2d 291 (7th Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982) (appearance of impropriety, and perhaps even actual impropriety, may not be raised for the first time on collateral attack); *Barry v. United States,* 528 F.2d 1094, 1100 (7th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976) (when the trial is "impeccably fair and just" an erroneous failure to recuse is harmless error).

A judicial impropriety serious enough, and secret enough, to escape everyone's notice before trial probably also would be serious enough to create an actual conflict of interest. By the time the trial has been completed, an appearance of impropriety may have ripened into an actual impropriety. If it did not, and if no one asked for recusal before trial, then there is no need for still another trial to vindicate the concerns that underlie § 455(a).

It is regrettable that the vacation plans were not disclosed. This cast an unfortunate light on what was otherwise a well-handled trial. Judges and counsel should keep in mind the need to disclose unusual degrees of social as well as professional affiliation. The Webb-Kocoras vacation plans should have been disclosed. As it turns out, the silence did not adversely affect any substantial rights of Murphy. He could have protected himself fully by acting on the information he and Lydon possessed. At all events any appearance of impropriety under § 455(a) is not actual impropriety, so that recusal does not retroactively invalidate judicial acts that preceded the motion Murphy filed.

Both the circumstances concerning the vacation plans of the judge and the prosecutor, and the unavailability of a transcript of the conference on the jury instructions, have led us to resolve all ambiguities in favor of Murphy. After this review we are confident that Judge Kocoras was scrupulously impartial in fact and conducted this trial in accord with the highest standards of the bench. Murphy has had a fair trial, and the judgment is just.

AFFIRMED.

SWYGERT, Senior Circuit Judge, concurring specially.

I concur fully with Parts I–IV of the court's opinion, although I am troubled in two respects. First, the proof of the interstate commerce requirement of the Hobbs Act and RICO hangs on a slim reed. Second, the use of the mails was so tangential to the success of the underlying frauds that the mail fraud convictions are also open to question. Nevertheless, this circuit's broad interpretation of both the interstate commerce elements and the mailings requirement dictate an affirmance of guilty on all these counts.

With respect to the recusal issue, I can concur only in the result ultimately reached by the court. I do not believe that a discussion of the merits of the recusal issue is necessary. Whether, at least in hindsight, the judge and prosecutor exercised poor judgment is irrelevant because the motion for recusal was untimely and waived.

The motion was filed several months after Murphy was sentenced. As such, it should be treated as a Fed.R.Crim.P. 33 motion for a new trial on the basis of newly-discovered evidence. In this circuit, such a motion could properly be entertained by the district court even though an appeal was pending. *See United States v. Ellison,* 557 F.2d 128, 132 (7th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977). Given defense counsel's close relationship and past vacation trips with the prosecutor and judge, the evidence supporting the recusal motion was not "newly-discovered evidence" within the meaning of Rule 33; had counsel exercised due diligence, the facts surrounding the relationship between the prosecutor and judge would have come to light much earlier. Given this failure to exercise due diligence, Murphy has waived his right to present the merits of his recusal motion. In short, the defendant's strategy was to "lay in the weeds," a tactic that should have and did backfire.

Such a holding would not contradict the strict waiver and timeliness rules announced by this court in *SCA Services, Inc. v. Morgan,* 557 F.2d 110 (7th Cir.1977). There, the petitioner's right to be in court to present the recusal motion was not in question: the motion was filed in reference to a civil case pending trial. The issue here is whether the petitioner, subsequent to his conviction and sentence, has "waived" his right to get back in court to present new evidence. This is a distinct issue from whether, assuming the petitioner has a right to be in court in the first place, his right to require recusal has been "waived." *Morgan* applies only in the latter context; the case says nothing about the law of waiver and timeliness in the context of postconviction proceedings.