**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Marvin ROTH, Defendant-Appellant.**

**No. 85–1284.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1985.

Decided Nov. 18, 1985.

Rehearing Denied Feb. 21, 1986.

Bradford Kessler, St. Louis, Mo., for defendant-appellant.

Joel Merkel, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before CUDAHY and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

A jury convicted Marvin Roth of possession with intent to distribute unlawfully a controlled substance, Talwin, and of conspiracy to distribute it. The judge sentenced him to 12 years in prison, and he appeals.

Roth was a retail druggist in Cahokia, an Illinois suburb of St. Louis. The government became interested in him when it discovered that, over a two-year period which ended in 1980 with a fire that destroyed his drugstore, the drugstore had received more than 400,000 tablets of Talwin (the trade name of pentazocine, a potent prescription analgesic)—which was 20 percent of the entire amount of Talwin prescribed in Illinois during that period— plus 264,000 tablets of pyribenzamine. The two drugs can be combined to create a substitute for heroin. The drugstore's records reported prescriptions for only a few hundred tablets of each drug; and testimony by a pharmacist employed by Roth confirmed these quantities. The re-

maining tablets have never been accounted for. Some may have been destroyed in the fire; but in reporting on the controlled substances destroyed in the fire, as he was required to do, Roth didn't mention Talwin. (Pyribenzamine is not controlled, so its loss didn't have to be reported.) The defense theory of why Roth bought these drugs in such immense quantities—a theory spun out on cross-examination of the pharmacist, since the defense put in no evidence—was that Roth was speculating on the possibility that their prices might rise. They did rise. But there is no evidence that Roth had ever bought any other drug in a greater quantity than he could dispense at retail.

The government's investigation of Roth lasted four years. On several occasions he was seen visiting a jewelry store owned by Joe Vitale. This led the narcotics agents to the trash from Vitale's shop, where they found an empty box of 500 Talwin tablets. Robert Jackson, an acquaintance of Roth's, testified that Roth told him that all his pyribenzamine went to Jimmy Vitale (Joe's father), that the drugstore had been burned down to keep him (Roth) from burning instead, and that he didn't have to worry about serious drug charges any more since Jimmy was dead.

The indictment charged Roth with conspiring with "other persons unknown" to distribute Talwin, as well as 163 counts of possession with intent to distribute. In the grand jury proceeding, the assistant United States attorney who was handling the case, Proud, had asked a drug enforcement agent, Law, whether "that conspiracy between Marvin Roth and others unknown was going on" during a certain period, and Law had answered, "Correct." A grand juror asked Law, "Was it ever determined how [Roth] was getting the Talwin out of the Pharmacy then and to whom?" Law answered, "It was never determined," and explained that if it had been determined the substantive charge would have been distribution rather than possession with intent to distribute. The juror persisted: "You never realized where it went?" Law answered, "We have got some good ideas"—and agreed when Proud then asked, "But

you're not absolutely certain about that ... at this very minute, so you don't want to speculate...."

The government in fact believed, and the evidence at trial showed, that the Vitales were the main and perhaps the only conduits through which Roth sold Talwin unlawfully, that is, without prescription. Roth argues that the government's failure to name the Vitales to the grand jury—the government's pretense that it didn't know who Roth's distributors were—was dishonest and poisoned the indictment.

Although the grand jury is as a matter of fact an investigative arm of the prosecutor's office, as a matter of theory it is a protection for the liberty of the subject; and it would be even less of a protection than it is—would be, in fact, no protection at all—if there were no sanction against a prosecutor's hoking up a completely phony case to get the grand jury to indict, knowing that his fraud would not be unmasked till trial or later since grand jury proceedings are ex parte and the accused has no right to appear or present evidence. Given the absolute immunity of prosecutors from civil damage suits, it is hard to imagine what the legal sanction for this misconduct would be unless it were dismissal of the indictment—after trial and conviction if need be, that is, if the fraud was not discovered earlier. The complete absence of a tort remedy, it might seem, would make this a stronger case for such a sanction than a case of illegally seized evidence.

But against this conclusion it can be argued that:

1. If the prosecutor's case is phony, the defendant will not be convicted and the indictment will have been a waste of time. Hence prosecutors will have no incentive to present a phony case to the grand jury; they would incur opportunity costs in doing so and court dismissal from office.

2. The wrong of an indictment procured by perjury is harmless if the defendant is duly convicted upon proof of guilt beyond a reasonable doubt. The purpose of requiring an indictment is to spare the innocent,

not the guilty, the travail of trial. The grand jury screens out of the criminal justice system persons whose guilt is so doubtful that the prosecutor is unable in an ex parte proceeding to persuade a majority of grand jurors that there is even probable cause to try the accused. It is such persons, who will not be convicted by a petit jury that must unanimously find guilt beyond a reasonable doubt in order to convict, who might fear that the prosecutor would procure an indictment by fraud, simply to harass them, since he would know he could not convict them. The defendant who is convictable, and convicted, is not likely to be the target of a fraudulently procured indictment; for if the prosecutor has enough evidence to convict, he will surely have enough evidence to procure an indictment without engaging in shenanigans. So maybe the focus of judicial concern with prosecutors' manipulating the grand jury should be on people who are indicted but not convicted or who are accused in the indictment but not actually indicted.

3. Criminal proceedings are sufficiently complex, protracted, and distracted by collateral inquiries as it is without the defendant's being able to challenge his conviction on the basis of the inadequacies of the case that the prosecutor presented to the grand jury. The proper remedy for misconduct by prosecutors is professional discipline, instances of which (one resulting in the resignation of an assistant United States attorney) are listed by the Supreme Court in *United States v. Hasting*, 461 U.S. 499, 506 n. 5, 103 S.Ct. 1974, 1979 n. 5, 76 L.Ed.2d 96 (1983). And yet the Supreme Court has long required the overturning of otherwise valid convictions if there is racial discrimination in the selection of the grand jury. See, e.g., *Rose v. Mitchell*, 443 U.S. 545, 551–59, 99 S.Ct. 2993, 2997–3001, 61 L.Ed.2d 739 (1979).

However we might be minded to resolve this interesting debate if we were writing on a clean slate, the slate is not clean. To begin with, the case law forces us to question whether an attack on evidence presented or representations made to the grand jury can ever overturn a conviction. We know that the conviction cannot be overturned by showing that the grand jury lacked sufficient evidence to make a rational finding of probable cause to believe that the defendant had in fact committed the crime charged in the indictment. We know therefore that the conviction cannot be overturned by showing that the indictment is founded on inadequate or incompetent evidence, such as hearsay evidence that would be inadmissible in the criminal trial or even evidence procured in violation of the defendant's constitutional rights. And we know these things from decisions by the Supreme Court that seem to go out of their way to prevent delving beneath the face of the indictment. See, e.g., *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974) ("an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence"); *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits") (footnote omitted).

One type of inadequate evidence is perjured evidence, but the Supreme Court's cases have not involved perjured evidence, and many lower courts have concluded that there must be an exception of some sort for such evidence. Most of these courts require, however, that the defendant show that the government knew it was using perjured evidence and that the indictment would not have been issued without it. For recent and illustrative discussions see *United States v. Claiborne*, 765 F.2d 784, 791–92 (9th Cir.1985); *United States v. Adamo*, 742 F.2d 927, 939–42 (6th Cir. 1984). (*United States v. Johnson*, 767 F.2d 1259, 1275 (8th Cir.1985), is representative of cases that seem to go even further; it says that an indictment is beyond challenge unless "the grand jury heard no evidence competent to sustain the indictment.")

The first requirement, that the government know the evidence was perjured, is intended to preserve the principle that an indictment cannot be challenged on the basis of the insufficiency of the evidence on which the grand jury acted. The objection recognized in these cases is not to the insufficiency of the evidence but to the prosecutor's knowledge of its insufficiency, which makes the case one of prosecutorial misconduct. Whether consistency is preserved by this route is not certain. The government knows whenever the evidence it is presenting to the grand jury is hearsay evidence, insufficient to convict. If this knowledge made an indictment founded on hearsay invalid, then *Costello*, which held that an indictment cannot be challenged as founded on hearsay, would be undone. What makes the government's knowing use of perjured testimony different is that it involves an element of deceit, which converts the issue from the adequacy of the indictment's evidentiary basis to fraudulent manipulation of the grand jury that subverts its independence. The second requirement in the cases, that the indictment would not have been issued except for the perjured testimony, confines judicial intervention to cases of prejudicial misconduct, that is, to cases where the misconduct made a difference to the defendant.

The high standard that these cases set cannot be met here if only because there is no reason to think the grand jury would not have indicted Roth if told that Joe and Jimmy Vitale, rather than persons unknown, were his distributors. Granted, the alleged perjury was committed by a federal law enforcement agent, Law, and also by the prosecutor, Proud (in his remarks about absolute certainty and about "others unknown"), rather than by a private person. But we do not see how this takes the case out of the orbit of the perjured-testimony cases, even if the federal government must be treated as a unit and the case thus dealt with as if the prosecutor himself had told all the alleged lies. The cases dealing with perjured testimony assume misconduct by the prosecutor; that

is what, in the courts' view, distinguishes such cases from *Calandra* and *Costello*. Whether a prosecutor lies himself or knowingly uses a witness's lies to get an indictment would seem to be conduct of the same wrongfulness and the same consequences for the defendant. Maybe it can be argued that a prosecutor's lying is even worse than his letting a witness lie, because the grand jury will trust a prosecutor more than it will trust a witness. But this seems too fine a shade of difference to support a different legal standard. And there is a contradiction in the argument: if the grand jury trusts the prosecutor, it will trust him not to put on the stand witnesses who lie, and it will therefore not be on guard against their lies either.

In a few cases, however, indictments have been dismissed because the prosecutor misled the jury, and the court did not insist on so high a showing of prejudice as in cases of perjured testimony. See *United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983), and cases discussed in *United States v. Chanen*, 549 F.2d 1306, 1309–10 (9th Cir.1977), especially Judge Friendly's opinion in *United States v. Estepa*, 471 F.2d 1132, 1136–37 (2d Cir.1972). Such cases are rare, are in conflict with the cases that say that even when the prosecutor's misconduct is "egregious" prejudice must be shown to warrant dismissing the indictment, e.g., *United States v. McKenzie*, 678 F.2d 629, 631 (5th Cir.1982), and, as recently suggested in a dictum in *United States v. Murphy*, 768 F.2d 1518, 1533–34 (7th Cir.1985), may be impossible to square either with the Supreme Court's decisions in *Costello* and *Calandra* or with the decisions that hold that before a conviction will be set aside because the prosecutor knowingly used perjured testimony to obtain the indictment the defendant must show that the indictment would not have been issued had the perjured testimony not been used. Maybe, indeed, the cases that relax this requirement when the challenge is cast in terms of prosecutorial misconduct are to be understood as rejecting the high standard that most courts impose on challenges to

indictments allegedly based on perjured testimony.

■ This court has suggested that an indictment can be invalidated only for "outrageous or intentional prosecutorial misconduct," *United States v. Udziela,* 671 F.2d 995, 1001 (7th Cir.1982) (footnote omitted), which is an apt description of the hypothetical case put earlier (the prosecutor's hoking up a completely phony case before the grand jury); and it did not add, only if the defendant can show that the indictment would not have been issued otherwise. But the reference to prosecutorial misconduct was a dictum. The government, upon discovering that perjured testimony had been given to the grand jury, had immediately notified defense counsel; and we went on to consider what the consequences of the perjured testimony should be. But, happily, to decide the present case we shall not have to decide whether an indictment can ever be dismissed for prosecutorial misconduct without a showing of prejudice to the defendant. For judged by the standard of *Udziela* ("outrageous or intentional prosecutorial misconduct"), the indictment in this case is not vulnerable to Roth's challenge.

■ The government knew there was a conspiracy to distribute Talwin, because the amount Roth had bought was too large for him to retail it personally. Cf. *United States v. Byrd,* 705 F.2d 335, 336 (8th Cir. 1983) (per curiam). He would have had to sell more than 600 tablets a day, and it is hardly likely that he would dispense so large a volume of drugs, in person, from his drugstore, which was described by the pharmacist witness as "tiny," and which filled only 80–200 prescriptions a day for all drugs. The risk of Roth's being caught would have been overwhelming. He had to have middlemen between him and the drug addicts who were his ultimate consumers; and while the ultimate consumer is not himself a conspirator either with the seller from whom he buys or with a seller like Roth who is farther up in the chain of distribution, see, e.g., *United States v. Bascaro,* 742 F.2d 1335, 1359 (11th Cir. 1984), the middleman is. The government

strongly suspected that the middlemen were the Vitales (and perhaps people working for them), but was not certain. The empty box of Talwin in Joe Vitale's garbage was not enough evidence to charge Joe; and so far as appears the government had no other evidence against Joe, and it never charged him (or Jimmy, who had died). The purport of agent Law's answers to the questions put to him by the grand jury and by Proud, and the overall impression created by his testimony and Proud's questions, were that the government was not certain who Roth's distributors had been; and that was the truth.

It was the truth, but it was not the whole truth; it was not the fullest possible statement of the government's knowledge. But before criticizing the government too harshly on this account (some criticism is merited, however), we must bear in mind two things. First, the government ought not be too quick to accuse persons in a forum from which they are excluded, or to seek to procure a public accusation (as an indictment is) that the accused cannot refute in a judicial proceeding because he is not named as a defendant but merely as an unindicted co-conspirator. See *United States v. Kramer,* 711 F.2d 789, 796 (7th Cir.1983); *United States v. Briggs,* 514 F.2d 794, 800–06 (5th Cir.1975). Second, the government had little, perhaps nothing, to gain from concealing the Vitales' name from the grand jury. Roth does not suggest that the Vitales were such pillars of the local community that if the government had accused them to the grand jury of conspiring with Roth the grand jury would have refused to indict him. (The Vitales' jewelry store wasn't even in Cahokia— wasn't even in Illinois—but was across the Mississippi River, in a Missouri suburb of St. Louis.) The government's case might well have been strengthened by naming the distributors; it is conceivable but hardly likely that if it had done so the grand jurors would have refused to indict Roth because they would not have been able to understand why the government was not charging distribution, but only possession with intent to distribute, along with con-

spiracy. It is again conceivable, but awfully conjectural, that the government, having investigated Roth for four years without discovering any distributors besides the Vitales, hoped to make the grand jury think that a larger operation had been discovered, by referring vaguely to the unknown persons with whom Roth had conspired, implying perhaps a large number, and not just the two Vitales.

All this is speculation. We do not know why the government secreted the Vitales' name, or that its motives were proper. They may not have been. It remains a mystery why the Vitales were not named, but although we are left with a feeling of unease about the government's conduct we cannot describe that conduct as perjury or as the suborning of perjury or as some other sort of outrageous or intentional misconduct that would justify ordering the indictment dismissed and the conviction overturned.

■ The only other issue meriting discussion is Roth's complaint that the evidence of an illegal conspiracy was too weak to allow Jackson to testify to admissions made to him by Roth. To be used as evidence of criminal guilt, an admission must be corroborated. "In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession." *Opper v. United States*, 348 U.S. 84, 89–90, 75 S.Ct. 158, 162, 99 L.Ed. 101 (1954). Although these concerns are particularly acute in cases where the defendant has actually confessed to the crime, the requirement of corroboration was quickly extended to admissions, "at least where ... the admission is made after the fact to an official charged with investigating the possibility of wrongdoing, and the statement embraces an element vital to the Government's case." *Smith v. United States*, 348 U.S. 147, 155, 75 S.Ct. 194, 198, 99 L.Ed. 192 (1954).

■ The final step was to extend the requirement to admissions made to inform-

ers rather than officials, and was taken in this circuit in *United States v. Bukowski*, 435 F.2d 1094, 1106 (7th Cir.1970). Although *United States v. O'Connell*, 703 F.2d 645, 647 (1st Cir.1983), treats this extension as an open question, we have found only one case which holds that such an admission need not be corroborated, *Kaneshiro v. United States*, 445 F.2d 1266, 1270 (9th Cir.1971), and many that hold it must be, though (except for *Bukowski*) without discussion of the issue. E.g., *United States v. Opdahl*, 610 F.2d 490 (8th Cir. 1979); *United States v. Fearn*, 589 F.2d 1316, 1321–22 (7th Cir.1978); *United States v. Johnson*, 589 F.2d 716 (D.C.Cir.1978) (per curiam); *United States v. Fasolino*, 586 F.2d 939, 941 (2d Cir.1978) (per curiam). Open or not, the extension seems to us well grounded not only in the language of *Opper* (the references to the self-interested accomplice and the malicious enemy) but in common sense: an informer, who may be testifying for the government to save his own skin, is surely no more reliable a witness to the defendant's admissions than a police officer would be. We do not know why Jackson testified in Roth's trial. He is a former mayor of Cahokia, and testified that although the government had asked him to testify, he had received nothing in exchange for agreeing to do so. But he is also a convicted extortionist and was on probation at the time of Roth's trial.

■ However, the admissions to which he testified were corroborated. The fact that Roth ordered vast quantities—too vast to supply the lawful demand or to be dispensed personally—of two drugs often combined to create a substitute for an illegal narcotic; the absence of any records showing the lawful dispensing of any but a trivial amount of the drugs; the empty box of Talwin found in a jewelry store's trash; the fact that Roth had been seen visiting the store several times, once carrying boxes; Roth's telephone records, which showed many calls to the store; the fact that one of the Vitales had told an informant that he knew a man who could get Vitale almost any kind of drug; and finally Roth's transfer (observed, like so much

else, by the agents who were maintaining the protracted surveillance of him) of a box to Vitale's car at a funeral, taken all together strongly suggested that Roth was distributing, and conspiring to distribute, Talwin for illegal purposes. By itself this evidence might not have proved Roth's guilt beyond a reasonable doubt. But all that was required was "extrinsic evidence corroborating the admission as a whole which, taken together with the admission, is sufficient to support a finding of guilt beyond a reasonable doubt." *United States v. Trombley*, 733 F.2d 35, 37–38 (6th Cir.1984) (per curiam). That there was.

Roth's other grounds for reversal do not require discussion.

AFFIRMED.

SWYGERT, Senior Circuit Judge, concurring.

I agree with the majority that the prosecutorial misconduct in this case does not warrant dismissal of the indictment, even under a rule that requires dismissal even though the defendant cannot demonstrate substantial prejudice from the misconduct. I also agree that there was sufficient evidence of the conspiracy to form a foundation for the admission of Jackson's extrajudicial statements.

Unlike the majority, however, I am convinced that the prosecutorial misconduct in this case merits strong criticism. The prosecutor manipulated the evidence and deceived the grand jury. The prosecutor deliberately sought to prevent the grand jury from ascertaining that the Government had little evidence to support its conspiracy charge. After four years of surveillance, the Government was well aware that its only evidence regarding conspiracy was the defendant's association with the Vitales. The prosecutor and the testifying agent, however, left the grand jury with the impression that the defendant was engaged in a massive conspiracy with various other persons. Even though I do not believe that

this misconduct rises quite to the level of "outrageous or intentional prosecutorial misconduct" warranting dismissal of the indictment, *United States v. Udziela*, 671 F.2d 995, 1001 (7th Cir.1982), I believe that the prosecutor's conduct here deserves more than passing criticism.

It is not merely conjecture or speculation to conclude that the Government added the conspiracy charge and misrepresented the strength of its evidence on that charge in order to shore up its charges of intent to distribute. At the first grand jury proceedings, the Government was unable to secure an indictment because, in my view, it did not have sufficient evidence regarding intent to distribute even though it had surveilled the defendant for four years. Without the conspiracy charge at the second grand jury proceeding, the possession charges would have failed, and vice versa. This is another instance of the disturbing abuse by the Government of employing the conspiracy statute to bolster its case. *See United States v. Cerro*, 775 F.2d 908, 913 (7th Cir.1985).

With these caveats, I concur.