**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dennis SCHWARTZ, Diane Henning, Harry Testa, Thomas Tucker, Joseph Ciolino, Michael Caliendo, and James D'Antonio, Defendants-Appellants.**

Nos. 84–2792 to 84–2798.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1986.

Decided March 28, 1986.

As Amended April 2 and April 25, 1986.

Ruben Castillo, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Marc Kadish, Maren Dougherty, Chicago, Ill., Dalton Grier, West Chicago, Ill., Joseph A. Lamendella, Lamendella & Filosa, Chicago, Ill., Terry Sullivan, Rolling Meadows, Ill., for defendants-appellants.

Before WOOD, EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

One of the booming industries in Illinois is the disposal of usable, but depreciated, cars in order to make false claims for insurance proceeds. Peter Basile ground up one car after another in a "cruncher" in order to buy new and better cars. *United States v. Basile,* 771 F.2d 307 (7th Cir. 1985). Benito Silva hired a team of mechanics to take his motor home apart so that he could both sell the parts and obtain compensation for a "theft." *United States v. Silva,* 781 F.2d 106 (7th Cir.1986). This case revolves around Belden Auto, a repair shop in Stone Park, Illinois. Dennis Schwartz, the owner of Belden Auto, and assorted hangers on would stage auto accidents. Some involved real damage, but the majority of the "accidents" were fictitious. Belden would attest to the cost of the necessary repairs. Police officers filled out accident reports, which supported Belden's claims and induced insurance companies to pay up.

Within eight months in 1981 Schwartz and his henchmen reported at least 13 fake accidents and bamboozled insurance companies out of at least $190,000. The cast of characters included Harry Testa, the Chief of Police of Stone Park. Two of the "accidents" involved Testa, and Testa may have been instrumental in producing police reports that satisfied the insurers' curiosity.

Some people pleaded guilty to various roles in the scheme; one defendant went to trial and did not appeal; still other people testified for the prosecution at trial. We have the cases of seven appellants. Schwartz was convicted of 31 counts of mail fraud, 18 U.S.C. § 1341, and one count of racketeering, 18 U.S.C. § 1962(c). See *United States v. Lane,* — U.S. —, — -—, 106 S.Ct. 725, 733-34, 88 L.Ed.2d 814 (1986). He received a total of seven years' imprisonment to be followed by five years' probation. Testa was convicted of four counts of mail fraud, fined $1,000, and was sentenced to six months' imprisonment plus three years' probation. Diane Henning, who lived with Schwartz and kept Belden's books, was convicted of a single

count of mail fraud and sentenced to three years' probation. Thomas Tucker, a lieutenant of the Stone Park police who submitted a false claim for himself and helped fabricate claims for others, was convicted of four counts of mail fraud, and was sentenced to six months' imprisonment, three years' probation, and fined $1,000. James D'Antonio, an acquaintance of Schwartz, was convicted of three counts of mail fraud for submitting a claim for a bogus accident. He received six months' work release, three years' probation, and a fine of $1,000. Two police officers became involved in the scheme by filling out reports on nonexistent accidents. Joseph Ciolino, a sergeant with the Stone Park force, was convicted of five counts of mail fraud and received three years' probation. Michael Caliendo, an officer of the Melrose Park, Illinois, police, was convicted of three counts of mail fraud and received 90 days' work release to be followed by 33 months' probation.

## I

The "events" of May 13, 1981, demonstrate the nature of this scheme. Belden Auto submitted insurance claims for two accidents that supposedly occurred on May 13. The first was a collision between a 1974 Ford Mustang owned by Denise Koester and a car supposedly owned by a "Carico Plumbing." Koester obtained a check for $1,226.41 from Allstate Insurance after submitting a report that her car had been in a collision and had been towed to Belden Auto by John Kirschbaum. Kirschbaum was convicted of mail fraud for falsely certifying that he towed this and other cars; he did not appeal. Koester, who testified for the prosecution at trial, said that there had been no accident. She got the idea for the bogus claim from Joseph Bulwa, Schwartz's brother, who pleaded guilty to mail fraud. On May 13 Bulwa gave Koester an accident report signed by Ciolino and told Koester to call her insurance company. Koester never talked to Ciolino about the accident. "Carico Plumbing," the other party to this "accident,"

also submitted an insurance claim and obtained a check for $5,681.92 made out to Carico Plumbing and Belden Auto. The check was negotiated by "John Mizener," apparently a pseudonym of Schwartz and Kirschbaum, and the proceeds landed in Belden's account.

The second "accident" of May 13 involved a 1977 Buick Regal owned by Tucker and a 1981 Cadillac Eldorado Biarritz. According to the accident report (like all documents, a report submitted by mail), Schwartz was driving the Cadillac when Tucker ran into the car from the rear, severely damaging the Cadillac and destroying the Buick. The claim was accompanied by a photo of a severely damaged Cadillac Eldorado Biarritz, and the report showed that the Cadillac's odometer had a reading of 506 miles. Tucker owned a Buick Regal, having registered title to one on May 12. Belden or Schwartz owned a Cadillac Eldorado, having acquired it from Andrew Ott, who owned a repair shop across the street from Belden. Ott, who pleaded guilty to mail fraud, transferred ownership to the Cadillac in January 1981 after it had already been damaged severely, with an odometer reading of 506 miles. The Cadillac was the "other car" in four accidents—a real one on January 15, 1981, bogus ones on May 13, June 1, and June 30.

After the supposed rear-end accident on May 13, Kirschbaum again "towed" the cars to Belden Auto, where the Cadillac had been sitting ever since January. Both Schwartz and Tucker made claims on their insurance policies. State Farm asked for a police report to back up the claims, and Tucker submitted a report signed by Ciolino. Schwartz then spoke with State Farm's representative by phone and repeated the claim that he had been driving the Cadillac when Tucker's car struck it from the rear. State Farm's representative spoke with Tucker's wife, who confirmed the story of the accident. Later the representative spoke with Tucker, who asked for cash rather than a replacement car. State Farm sent Tucker checks for $2,924.46 and $1,550.54, which he acknowledged. It sent three checks aggregating

$9,314.65 to "Dennis and Diane Schwartz" for the Cadillac. Schwartz and Henning endorsed these checks, which Henning cashed. Belden Auto gave Tucker a check for $2,000.

Both police reports for the May 13 "accidents" were signed by Ciolino. Ciolino was the shift commander on duty at the police station that evening. The first accident supposedly occurred at 6:48 p.m., and Ciolino's report recites that he was notified at 6:50. The "accident" supposedly occurred right in front of the police station. The report includes a diagram of the "crash", and the diagram is accompanied by the following: "Veh. # 2 [Koester] stated she was S/B [south bound] 1600 Mannheim Rd. when a F/W [white female] darted S/B off of curb and swerved into Veh. # 1 pushing it into curb." This would lead a reader to conclude that Ciolino had visited the scene of the crash (or rather that the scene of the crash had visited the police station) and spoken with Koester. A patrol officer of the Stone Park police testified that the preparation of accident reports usually entails discussions with the drivers involved and that a diagram would be prepared when the officer reached the scene of the accident before the vehicles had been moved. Of course Ciolino had not seen any crash or spoken with Koester. Ciolino's report of the "crash" between the Buick and the Cadillac was timed at 8:42 p.m. and again includes both a diagram and descriptions that would lead a reader to conclude that Ciolino had spoken with the parties involved at the scene.

The actors in the events of May 13 gave different excuses. Henning testified and denied knowledge that any of the events was bogus or that any of the money she obtained had derived from fraud. Tucker presented testimony of friends who said that he got drunk now and again. His daughter testified that she received a 1977 Buick Regal on May 5, 1981, that someone broke its windshield, that she gave the car to her father and never saw it again. Tucker told his wife that it had been in an accident. Ciolino did not testify. Schwartz

did not put on a defense, but it was stipulated that he paid more than $16,000 in restitution to several insurers on account of these claims and others. Kirschbaum testified that the records of Belden were disorganized, so that he did not know what he had towed and when. He conceded signing "Bill Mizener's" name to some checks at Schwartz's request but denied knowing that anything was amiss.

Six appellants (all except Schwartz) insist that the evidence is insufficient. Four of these six are whistling in the dark. Tucker mailed reports and accepted checks (including a $2,000 check from Belden) for a "rear end accident" between his car and a Cadillac that never left Belden Auto. Testa submitted two false claims for accidents; in each Testa collected insurance proceeds for autos he did not own, on account of accidents that never occurred. Thomas Peppers, who submitted a bogus claim for one of these "accidents," testified at trial that the whole thing was fabricated at a meeting he had with Testa and Schwartz. D'Antonio, too, submitted a false insurance claim for a nonexistent accident that occurred to a car D'Antonio did not own. (This car, a 1981 Cadillac Seville, was registered to Diane Henning.) Some of the checks for the proceeds were sent to D'Antonio's home, and he also received $1,100 from Belden Auto. D'Antonio, like some other defendants, claims that he did not sign several documents that bear his signature, but this was a question for the jury.

■ Henning was acquitted on twelve counts and convicted only on Count One, which charged all defendants with a scheme to use the mails to defraud. This count draws attention to the repeated use of the 1981 Cadillac Eldorado. The evidence shows that Henning was Belden's bookkeeper and was well aware of its daily transactions, that she endorsed and depos-

ited in her own account checks from several fraudulent claims, that she owned one of the cars that was used to make the specious claims, and that she signed checks that were transparently the result of fraud. One check, for example, was made out to "Quality Heating c/o William Mizener." This was sent to Henning's home. Kirschbaum endorsed the check as "Mizener" and turned it over to Henning, who endorsed and deposited the instrument. There is more, but this is enough. Henning portrays herself as naive, but the jury was entitled to take a different view.

■ Henning seeks to cinch her argument by asserting that her position (that she was unaware of the fraud swirling around her)

is strengthened by an analysis of what members of the jury said after the return of the verdict. In a conversation with members of the jury after the return of the verdict, when asked why they convicted Defendant Henning on Count 1, but acquitted her on all other Counts, jury foreman [omitted] and juror [omitted] both responded that they convicted Diane Henning because she had an interest in the Cadillac Seville named in Count 1. In fact, the car named in Count 1 was a Cadillac [Eldorado] Biarritz, with which Diane Henning had no interest.

This argument is doubly improper. First it depends on "evidence" that is not in the record.* Second, it is an effort to impeach the verdict by scrutinizing the mental processes of the jurors. A juror may neither testify nor provide an affidavit about his mental processes. Fed.R.Evid. 606(b). A juror may testify about "extraneous prejudicial information" or any "outside influence" on the jury, but nothing more.

The Rule was designed both to protect the judicial process from efforts to under-

---

* Counsel asserted at oral argument that this material is in the record because counsel earlier told the district judge in open court the same story that appears in the appellate brief. Statements by counsel to the district judge after the trial is over are not evidence. It was as improper to recount these conversations to the district court as it is to place them before us. A violation of the rule against reference to case-specific matter that is not in the record may not be defended by pointing to an earlier violation of the same rule.

mine verdicts by pointing to the jurors' thoughts and deliberations and to protect the jurors from being pestered by lawyers. The Advisory Committee recommended the rule in the form it now has. The House amended the proposal, believing that some inquiry should be allowed, for example to detect compromise verdicts. H.R.Rep. No. 93–650, 93d Cong., 1st Sess. (1973), U.S. Code Cong. & Admin.News 1974, p. 7051. The Senate took the position that there should be no inquiry—a position supported by *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), and *Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)—and endorsed the original proposal. S.Rep. No. 93–1277, 93d Cong., 2d Sess. (1974), U.S.Code Cong. & Admin.News 1974, pp. 7051, 7060. The Senate was concerned that the House's amendment "would have the effect of opening verdicts up to challenge on the basis of what happened during the jury's internal deliberations...." It concluded, too, "common fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts." The conference committee adopted the Senate's proposal. H.R.Conf.Rep. No. 93–1597, 93d Cong., 2d Sess. (1974), U.S.Code Cong. & Admin. News 1974, p. 7051. The prohibition against any inquiry into the jurors' mental processes shields jurors from the more obnoxious forms of prying. It is hard enough to be a juror without having to put up with counsel's later questions into what brought about the verdict. If what lawyers learn is inadmissible, they have less reason to pursue jurors. The court has recently expressed concern about references to mental processes of jurors. *United States v. Burke*, 781 F.2d 1234, 1246 (7th Cir.1985). We expect to see them no more. We trust that district judges will prevent counsel from using such information before them, as we shall prevent its use here.

■ The evidence with respect to Ciolino and Caliendo is closer than with respect to any of the other defendants. Ciolino and Caliendo were implicated in the scheme only to the extent that they furnished police reports for nonexistent accidents. So far as the record shows, neither Ciolino nor Caliendo received a payment for filling in the reports. Neither Ciolino nor Caliendo testified at trial, but their lawyers argued that each simply took down information provided by others and did not know that the information was false.

Caliendo was an officer of the Melrose Park police, and although the evidence shows that Caliendo recognized Chief Testa, it does not show that he was friendly with the other participants. He filled out two reports of nonaccidents.

The first involved Chief Testa and a 1981 Lincoln Continental owned by Thomas Peppers. The Lincoln had been demolished in an earlier accident and was the basis of claims of non-accidents on March 25 and April 28, the latter involving Testa (said to be driving a car that had been the subject of a claim on January 30). On April 28 Anthony Stellato, the Melrose Park dispatcher, dispatched Caliendo to the scene of an accident, which had occurred at 7:01 p.m. and been reported to the police at 7:05. This call apparently reached Caliendo at home; his wife testified that he quickly left, saying that he had to go to Stone Park to talk to Chief Testa. Caliendo's report indicates that he arrived at the scene at 7:07. ("Arrived at scene" is preprinted on the form; Caliendo did not cross this out.) Because neither the Lincoln nor the car Testa supposedly drove was mobile, there was no "scene" at which Caliendo could have arrived. It also would have been impossible to tow the cars away between 7:01 and 7:07. The report nonetheless contains a complex diagram showing how the cars crashed at an intersection as one was entering a thoroughfare, and it depicts the cars as continuing into concrete pillars. Peppers testified for the prosecution and denied talking to Caliendo at the scene or anywhere else; Testa did not testify.

Caliendo's second report of a non-accident described a collision between a 1977

Ford Thunderbird, supposedly driven by Peppers, and the 1981 Cadillac Eldorado Biarritz on June 30. The Cadillac was of course sitting serenely at Belden Auto, where it had been ever since January 15. The Melrose Park dispatcher told Caliendo to go to Belden Auto to make a report, because the cars had been "towed" by the time the dispatcher put out a call. Caliendo's report of this accident does not contain a diagram—supporting the testimony of several witnesses that the existence of a diagram means that the officer visited the scene. (An officer of the Melrose Park police testified that he makes diagrams only when the accident involved loss of life or serious injury, which none of the bogus accidents did, and the jury could infer that this is the ordinary practice.) The report nonetheless states that Caliendo "arrived at scene" at 7:07 p.m., only four minutes after the crash. It also relates: "Driver of Unit # 1 [Peppers] stated that he was S/B in the 1100 Blk. of 31st Ave. when a youth ran out onto the street and to avoid hitting the youth he cut his wheels to the right and struck Unit # 2 which was parked." Peppers testified at trial that he had not talked to Caliendo.

On April 12, 1982, Joseph McQuaid, an agent of the Illinois Division of Criminal Investigation, interviewed Caliendo. Caliendo claimed that he had visited the scene of the April 28, 1981, "crash" and spoken with both Peppers and Tucker. He told McQuaid that he had visited the scene of the June 30 "accident" and spoken with Peppers there, although the cars had been towed before he arrived. The prosecutor introduced McQuaid's testimony to show that Caliendo had made false exculpatory statements.

The evidence against Caliendo is close. He had no apparent ties with the other players (except perhaps Testa), and he had no apparent motive to fill out false reports. No evidence suggests that he received compensation for his deeds. Caliendo did not testify, but according to his counsel the evidence shows that he took the report of the Peppers-Testa non-accident at the Stone Park police station from Chief Testa, and that he believed whatever Testa told him. (How Testa had reached the Stone Park police station by 7:07 after an accident in Melrose Park at 7:01 is a bit of a mystery.) A jury could have found, as Caliendo maintains, that he was an innocent victim of false statements and was duped by Testa and Peppers into supplying the reports. We think, however, that the jury also could have found that Caliendo knew at the time that his reports were bits of fiction. Peppers testified that he never spoke with Caliendo, yet the June 30 report contains supposed statements by Peppers. Caliendo was sent to the "scene" of the April 28 "accident," and his report contains a diagram implying that he saw the vehicles; yet there was no scene and the alternative explanation—that Caliendo took the information from Testa at the Stone Park police station—implies an implausible time sequence and calls the diagram into question. Caliendo gave false denials to an investigator, and false denials may be the basis for an inference of guilt. Caliendo's is a close case, but we think it the sort of case in which the jury must have the final say.

We deal finally with Ciolino, a sergeant of the Stone Park police. He frequented Belden Auto (which was two doors from the police station). He knew Schwartz and the others. One of the two reports he filled in concerned an "accident" that supposedly occurred right in front of the police station at 6:48 p.m. on May 13, 1981. Ciolino's report stated that the accident was reported to the police at 6:50 p.m. and strongly implies that he spoke with Koester, who testified at trial that there had been no accident and that she had not spoken with Ciolino. A jury was entitled to conclude that Ciolino knew that the accident had not occurred—it is hard to hide a crash in front of the stationhouse. The conclusion that Ciolino filled out a bogus report, to which he added verisimilitude by drawing a diagram and reporting a conversation with the driver, supports the further inference that Ciolino knew the report would be put to no good end. The second

report of May 13 concerned a crash between his superior, Lt. Tucker, and his friend Schwartz. Again the jury could infer—from Ciolino's knowledge of the parties, from the misleading diagram and report of statements from the parties, and from the fact that Ciolino frequented Belden Auto, where he must have seen the immobilized Cadillac Eldorado Biarritz that Schwartz supposedly was driving on May 13—that Ciolino filled out a false report knowing that it would be used for a fraudulent purpose. See *United States v. Wormick*, 709 F.2d 454 (7th Cir.1983). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789. 61 L.Ed.2d 560 (1979). The proof against Caliendo and Ciolino meets that standard.

## II

■ 1. Count One of the indictment alleged that all defendants took part in a scheme to defraud the insurance companies. This charge of a single common scheme supplied the basis for the joinder of the many charges of wrongdoing. The joinder was proper under Fed.R.Crim.P. 8(b) because of the common elements in the scheme—the same cars being "crashed" over and over, with the same people playing the same roles repeatedly. It would have been hard for the jury to understand the role of any defendant without seeing the whole sequence of events; this is the sort of case in which joint trials are most appropriate.

The defendants say, however, that the counts should have been severed because the prosecution did not prove the common scheme. This is wrong for two reasons. First, the defendants concede that the prosecutor alleged a common scheme in good faith. This circuit does not employ a concept of "retroactive misjoinder," and so the

joint trial was proper even if the proof on Count One was insufficient. *United States v. Dounias*, 777 F.2d 346 (7th Cir.1985); *United States v. Velasquez*, 772 F.2d 1348 (7th Cir.1985); cf. *United States v. Wozniak*, 781 F.2d 95 (7th Cir.1985). Second, the prosecutor did prove the common scheme. We reserved in *Dounias* and *Velasquez* the possibility of finding misjoinder if the charge making the joinder possible had no colorable basis in fact, but that is hardly a problem here, for the jury convicted everyone charged under Count One of the common scheme. The evidence supported this conviction.

The defendants say that the prosecutor failed in his proof, and to show this they assert: "The trial court, in this case, at the close of the government's case found that the government failed to prove the overall scheme to defraud, but rather that the government proved separate, individual schemes." Similar statements appear elsewhere in the briefs, each time without citation. No wonder the citation is missing. The closest approximation we can find is this statement by the district court:

> From this reading of the authorities, I have decided that in this case I should not instruct the jury, nor should I find that there is any one scheme to defraud. I am convinced from reading the cases that if I did that and the defendants are convicted and they appealed, the Court of Appeals would have an insurmountable difficulty to resolve the matter while by ruling that there was no one common scheme I will minimize the difficulties of this case.

The judge was right. Count One charged the existence of a scheme to defraud, not just a single act of fraud. Had he taken away from the jury the question whether there was such a scheme, there would have been "an insurmountable difficulty" with the conviction. But all the judge did was put to the jury the question whether, as the indictment charged, there was a common scheme. This hardly supports defendants'

repeated assertions that the judge found the *absence* of a scheme.

■ 2. Because several of the defendants asserted that they had been gulled along with the insurance companies, and that they did not realize that they had been pawns in Schwartz's scheme, the district judge gave an "ostrich" instruction. The court took this instruction from this circuit's 1965 pattern jury instructions. The last sentence of this instruction states: "No person can intentionally avoid knowledge by closing his eyes to facts which should prompt investigation." We have upheld this instruction many times, most recently in *United States v. Ramsey*, 785 F.2d 184 (7th Cir.1986). These decisions control here. We suggest in *Ramsey* that district courts choose more felicitous language, but we adhere to the conclusion of that case that the language chosen is not reversible error.

The nature of the defense made this an appropriate case for an ostrich instruction. Henning, Ciolino, and Caliendo, who say that they were innocent of knowledge, knew enough to prompt inquiry, and the jury was entitled to be told that a person who smells a rat and then avoids actual knowledge may already know enough for the purpose of the law.

■ 3. The defendants tendered an instruction informing the jury that good faith is a defense to a charge of mail fraud. The court told the jury that good faith is a defense, but it did not separately instruct the jury that the prosecution must prove the lack of good faith. It did not need to. Another instruction told the jury that the government must prove that the defendants intended to deceive others and to obtain money by "false and fraudulent pretenses." It defined false and fraudulent as something "known to be untrue or ... made with reckless indifference as to its truth". The instructions put the burden on all of these elements on the government. "Good faith" is just the other side of knowingly making false statements. The jury

could not have thought the defendants knowingly made false statements, within the meaning of these instructions, and still thought that they acted in good faith. It therefore was unnecessary to state the burden yet another time when mentioning good faith.

■ 4. In closing argument the prosecutor conceded that the case against Kirschbaum was the "weakest" one the government had presented. The defendants say that this was improper because it invited the jury to convict everyone if it convicted Kirschbaum. We think the argument candid rather than improper (although we would have picked Ciolino or Caliendo rather than Kirschbaum). A prosecutor need not pretend that all cases are equally strong. And the prosecutor was obviously inviting the jury to convict everyone no matter what they made of Kirschbaum's case.

■ 5. Caliendo moved to suppress the statements he made to agent McQuade on the ground that he was not given *Miranda* warnings. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The problem with this claim is that Caliendo was not "in custody."

Caliendo voluntarily attended an interview with two agents and with an assistant state's attorney. He was not under arrest, and the atmosphere (one officer of the law talking with another) was not coercive. An officer of the police hardly needed a refresher on the contents of *Miranda;* it would be a shock if Caliendo did not have a card with the warnings on his person at all times. *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), holds that a probationer who discusses things with a probation officer is not in custody; *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), holds that a suspect who voluntarily submits to an interview at the police station is not in custody. See also *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48

L.Ed.2d 1 (1976). This case is well within the bounds established by *Murphy, Mathiason* and *Beckwith.*

### III

We come at last to a consideration that troubled the district judge. In August 1982 a grand jury of Cook County, Illinois, returned ten indictments charging Schwartz and the other defendants with insurance fraud. In October 1982 the state prosecutor asked the United States Attorney to seek a federal indictment. The state prosecutor expressed concern that the case had been assigned to a judge known to be favorable to defendants. The United States Attorney began a federal investigation.

In January 1983 Schwartz pleaded guilty to the state charges and was sentenced to a period of work release and ordered to pay restitution. The federal indictment was returned in September 1983, and the state charges against the other defendants were dismissed.

▉▉▉ The district judge to whom this case was assigned felt put upon. He stated, among other things:

> I feel imposed upon by you lawyers for the prosecution. Here I am sitting for five weeks with a crowded docket hearing a case that is here only because some lawyers weren't satisfied with Judge Joyce in the Circuit Court of Cook County. And listen: I want you lawyers to know that I resent it. And I am going to speak to the highest people in the country about it, if I can.
>
> A complicated case [is] here only because some arrogant lawyer didn't like the fact that the case was assigned to Judge Joyce—an imposition on the criminal justice system of the Federal Courts.
> . . . .
> I don't think prosecutors have a right to do what has been done in this case. Of that, I am sure. Young prosecutors taking 10 indictments in the State Court—in which more defendants were named as defendants than were named

here; then transporting them over here to the Federal Court merely because they don't like the judge to whom the case was assigned. I think it is despicable conduct by the lawyers.

The judge was entitled to make his views known, but these views do not bind the prosecutor. The Supreme Court long ago established that the United States may bring a criminal prosecution even after a person has been tried for and acquitted of the same conduct in state court. *Grafton v. United States,* 206 U.S. 333, 354–55, 27 S.Ct. 749, 755, 51 L.Ed. 1084 (1907) (dictum). Separate sovereigns may make their own decisions—be they complementary or conflicting—about who should stand trial, and for which charges. E.g., *Heath v. Alabama,* —— U.S. ——, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). The question whether to proceed with a prosecution is for the Executive Branch and the grand jury alone. Selection of the charge is a central part of the executive function. *Wayte v. United States,* —— U.S. ——, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

True it is that this prosecution consumed much time of a district judge. It has consumed much of ours as well. But in order to prosecute these defendants the government had to forgo other cases. Whether it was wise to go after these defendants or instead to prosecute some other people— people who may have escaped judgment because of the need to devote resources to this case—is something the United States Attorney knows better than a judge. Only he sees the full palette of cases; only he knows what had to be given up to prosecute Schwartz and his henchmen. Courts cannot review the wisdom of such decisions. They have neither the constitutional authority to do this nor the information necessary to make wise comparative decisions when they do not see the cases that are not brought. *United States v. Brock,* 782 F.2d 1442, 1444 (7th Cir.1986).

The defendants ask us to "invoke [our] supervisory powers to dismiss [the] indictment." We have no such powers. The "supervisory power" of the federal courts is a power to formulate rules of the common law when neither constitution nor statute supplies a rule of decision. *United States v. Widgery*, 778 F.2d 325, 328–29 (7th Cir.1985). Cf. *United States v. Gonsalves*, 781 F.2d 1319 (9th Cir.1986) (no supervisory power to dismiss indictment as too complex or unmanageable). The constitution supplies a rule of decision here: when the Executive Branch seeks to prosecute, and a grand jury assents, that is sufficient to send the case on to trial unless there is a recognized legal defense. E.g., *United States v. Campagnuolo*, 592 F.2d 852 (5th Cir.1979); *United States v. Brown*, 602 F.2d 1073 (2d Cir.), *cert. denied*, 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979); *United States v. Sears, Roebuck & Co.*, 719 F.2d 1386 (9th Cir. 1983), *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984); *United States v. Zielezinski*, 740 F.2d 727 (9th Cir.1984). We have consistently rejected claims that irregularities occurring before the grand jury permit a court to dismiss an indictment. E.g., *United States v. Burke, supra*, 781 F.2d at 1245; *United States v. Roth*, 777 F.2d 1200, 1203–06 (7th Cir.1985); *United States v. Murphy*, 768 F.2d 1518, 1533–34 & n. 2 (7th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986). It follows that an indictment obtained without irregularities—save for the defendant's claim that the prosecutor ought not have sought one in the first place—calls for a trial. Cf. *United States v. Mechanik*, — U.S. ——, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). The choice of which offenses to prosecute, from among the many that are supported by adequate cause and otherwise indictable, is constitutionally committed to the Executive Branch.

The defendants nonetheless ask us to reverse the conviction because the United States Attorney did not obtain the approval of the Assistant Attorney General for the Criminal Division, which is required under what has come to be known as the *Petite* Policy of the Department of Justice. The defendants' representation that the prosecutor "secured the instant indictment without complying with the Department of Justice policy on successive state-federal prosecutions" is unsupported by anything in the record. When we asked counsel for a reference at oral argument, he could supply none. This is another point at which we have been troubled by the apparent lack of care or candor by defendants' counsel. The prosecutor represented at oral argument that a *Petite* clearance had been obtained.

It is no matter. We have held that the absence of a *Petite* clearance does not authorize reversal of a conviction. *United States v. Mitchell*, 778 F.2d 1271, 1276–77 (7th Cir.1985); cf. *In re Klein*, 776 F.2d 628, 635 (7th Cir.1985). The Department of Justice may give such weight as it chooses to its internal rules. In all but the most exceptional cases, he who writes the rules may choose the sanctions for noncompliance. See also *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). As we observed in *Mitchell*, an effort by the Judicial Branch to foist on the Executive Branch a sanction it does not wish could lead the Executive Branch to abandon the *Petite* Policy rather than suffer unwarranted reversals. Neither defendants nor courts would benefit from such an outcome.

AFFIRMED.