In re METROPOLITAN METALS, INC., Debtor.

Joseph F. and Caroline ENOS, Plaintiffs,

v.

Charles J. DeHART, III Trustee in Bankruptcy for Metropolitan Metals, Inc., Defendant, and UNITED STATES of America, Defendant.

Bankruptcy No. 79–318.
Adversary No. 5–95–0331A.

United States Bankruptcy Court,
M.D. Pennsylvania.

April 24, 1996.

Hans A. Stoeckler, No. Dighton, MA, for Enos/Plaintiffs.

Stephen Moore, Edward Rothman, Harrisburg, PA, for Trustee, Charles DeHart, Esq./Defendant.

Charles DeHart, III, Trustee in Bankruptcy, Hummelstown, PA, Angelo Frattarelli, U.S. Dept. of Justice, Washington, DC, for USA, IRS/Defendant.

## OPINION AND ORDER

JOHN J. THOMAS, Bankruptcy Judge.

The Metropolitan Metals, Inc. ("Metropolitan") bankruptcy was filed under the Bankruptcy Act of 1898 and began as an involuntary petition filed March 29, 1979. The case has spawned various issues dealing with recusal and disqualification currently pending before this court and are dealt with herein.

The case was originally referred by the district court to Bankruptcy Judges Thomas C. Gibbons and Thomas Wood. On August 9, 1982, the Honorable Robert J. Woodside began serving as bankruptcy judge, sitting in the Harrisburg division, succeeding Judge Wood who served before him. Shortly thereafter, it was called to that court's attention that a former associate of Judge Woodside, Lloyd R. Persun, Esquire, represented two of the petitioning creditors who had placed Metropolitan into bankruptcy. Judge Woodside, in a Memorandum of Recusal dated November 6, 1984, recused himself from some matters while continuing to administer others where Lloyd R. Persun, Esquire, was not specifically involved. No appeal of that decision was made.

The docket indicates that, at all material times in the pendency of this case, Joseph F. and Carol Enos were represented by various counsel.[1] Their most recent lawyer, Hans A.

Stoeckler, entered his appearance on behalf of Joseph F. and Carol Enos on March 10, 1995. Shortly thereafter, on March 24, 1995, Judge Woodside recused himself from the entire proceeding and transferred the case to the Wilkes–Barre division for future administration.

Until the recusal of Judge Woodside, the case had been administered by the Harrisburg division with the only matter pending before the Wilkes–Barre division being the claims litigation between Charles J. DeHart, III, Trustee in Bankruptcy for Metropolitan Metals, Inc., and Joseph F. Enos.

The undersigned bankruptcy judge succeeded to the Honorable Thomas C. Gibbons, sitting in the Wilkes–Barre Division, on January 10, 1992. This court's first official contact with regard to this case was a telephonic status conference conducted May 28, 1992, between the court, Edward DeFranceschi, then attorney for Enos, and Edward Rothman, Esquire, attorney for the trustee. At a subsequent telephone conference conducted July 9, 1992 between the same parties, the court was notified that a material issue then pending in a district court in Massachusetts would have a significant impact on the claims litigation in this court. Judicial economies suggested that the proceeding before me be held in abeyance pending the decision of the district court in Massachusetts. Thereafter, periodic status reports were solicited and obtained, which status reports have been docketed as part of the case in chief.[2]

Edward Rothman, Esquire, an attorney with the law firm of McNees, Wallace & Nurick, has served as counsel for the trustee since September 23, 1981.

Prior to my appointment to the bench, the same Edward Rothman, Esquire, served as counsel to me as bankruptcy trustee in the case of Michael A. Minichello, Sr. t/d/b/a Prestige Pool, Christmas Boutique ("Minichello/Prestige Pool"). He first served as special counsel from December 8, 1988, and then was appointed general counsel. In that capacity, Attorney Rothman represented me

---

1. Russel Wilkins, Esquire; Edward DeFranceschi, Esquire; John A. Noonan, Esquire; John Wall, Esquire; David Shaunessey, Esquire; and Hans A. Stoeckler, Esquire.

2. See reports docketed to document numbers 39, 41, 42, 44, 46, and 47.

as trustee only and not individually. Upon being sworn in as bankruptcy judge on January 10, 1992, I withdrew and/or resigned as trustee of the Minichello/Prestige Pool case and was succeeded by Leon Haller, Esquire, who has continued to retain Edward Rothman, Esquire, as his counsel. Since Attorney Rothman did not represent me individually, his representation of myself as trustee also ceased on January 10, 1992. Edward Rothman, Esquire, has neither before nor after that date represented me on any other matters either personally or professionally. In 1995, in a telephonic conversation between Edward Rothman, Esquire, and myself, Attorney Rothman suggested that I may be required to testify as a witness in the Minichello/Prestige Pool case and asked whether that would affect my ability to adjudicate the present litigation. It was agreed that this matter should be called to the attention of the immediate parties by Attorney Rothman directing correspondence to me upon which I would schedule a hearing. This telephonic conversation occurred on or about April 14, 1995 and Attorney Rothman's correspondence to the court was dated April 18, 1995 and copied to Attorneys Hans A. Stoeckler and George P. Eliopoulos.

On April 28, 1995, Joseph F. and Carol Enos moved to compel the withdrawal of the trustee DeHart's attorney, Edward Rothman, Esquire, by reason of this relationship with the court.

On June 19, 1995, this court, on its own motion, set a hearing to determine whether or not it should recuse itself from the current litigation. On July 25, 1995, a record was made regarding these two pending issues.

While these matters were pending before the court, Joseph F. and Carol Enos filed a Motion to Vacate Judicial Determinations Made by a Disqualified Court or, in the Alternative, to Certify the Record for Review by the United States District Court (Petition for Writ of Mandamus). Succinctly, the Enos' were attempting to negate all earlier adjudications and dispositions entered by Judge Woodside based on the argument that his relationship to the estate tainted his administration.

These three identified issues strike at the very heart of the future (and past) administration of this case. Because the issues of recusal of myself and Judge Woodside are controlled by the same body of statutory and case law, they should be considered together in this opinion. Notwithstanding that conclusion, the court has not ignored the question of whether a bankruptcy judge can invalidate the decisions of a fellow bankruptcy judge.

Before we begin our analysis of the law, it should be pointed out that both Attorneys Rothman and Stoeckler have taken the position that I should continue to administer the Metropolitan Metals, Inc. case. The issue of my own recusal has been brought to the parties' attention based on my sua sponte motion.

The court will first direct its attention to whether Edward Rothman, Esquire, should be disqualified from further participation by reason of those facts heretofore enunciated.

The responsibility of lawyers is governed by the Pennsylvania Rules of Professional Conduct adopted October 16, 1987 and applying to those matters occurring on or after April 1, 1988. *Order of the Supreme Court of Pennsylvania, dated October 16, 1987 (Order No. 412, Disciplinary Docket No. 2)*

In their motion, the Enos' rely on Rule 3.5 of the ABA Model Rules of Professional Conduct, which is identical to Rule 3.5 of the Pennsylvania Rules of Professional Conduct. Rule 3.5 reads as follows: "A lawyer shall not: (a) seek to influence a judge, juror, prospective juror or other official by means prohibited by law; (b) communicate ex parte with such a person except as permitted by law; or (c) engage in conduct disruptive to a tribunal." Furthermore, the comment accompanying each rule is helpful in explaining and illustrating the meaning and purpose of the rule and it reads as follows:

"Many forms of improper influence upon a tribunal are proscribed by criminal law. Others are specified in the ABA Model Code of Judicial Conduct, with which an advocate should be familiar. A lawyer is required to avoid contributing to a violation of such provisions.

"The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics." *Pa.Rules of Professional Conduct, Rule 3.5 cmt. (1995).*

■ Applying Rule 3.5 to the facts as we have already discussed, we must determine whether Attorney Rothman sought "... to influence ..." me by any means prohibited by law. These facts do not appear to suggest that Attorney Rothman, acting either in his capacity as former representative of myself as the Minichello trustee, or in his position as a lawyer discussing a prospective trial with a potential witness, as memorialized in his letter of April 18, 1995, has sought to influence me in my capacity as a judge in the case of Metropolitan Metals, Inc. The letter of April 18, 1995, which has been made a part of the docket as an attachment to item number 840, is self-explanatory and conveys no impression of impropriety.

■ The second prohibition of Rule 3.5 proscribes ex parte communication with the court "except as permitted by law."

Ex parte contact with the court is the subject matter of Federal Rule of Bankruptcy Procedure 9003, which indicates that: "Except as otherwise permitted by applicable law, any examiner, any party in interest, and any attorney, accountant or employee of a party in interest, shall refrain from ex parte meetings and communications with the court concerning matters affecting a particular case or proceeding."

The principal reason for the telephonic communication between Edward Rothman, Esquire, and myself on April 14, 1995 was to discuss my status as a witness in the Minichello/Prestige Pool case, a case transferred to Judge Woodside contemporaneous with my appointment. Any discussion of whether this relationship I had with Edward Rothman, Esquire, should cause my recusal was perfunctory and properly resulted in Attorney Rothman addressing me in written correspondence while copying other parties in interest. Attorney Stoeckler's motion to compel the withdrawal of Edward Rothman, Esquire, filed April 28, 1995, and the response of Attorney Rothman to that motion filed May 24, 1995, was an obvious indication that immediately confronting the recusal issue was indeed justified. Accordingly, the court, on June 19, 1995, issued an Order setting a hearing on the recusal issue as well as Attorney Stoeckler's motion to compel the withdrawal of Attorney Rothman. The court concludes, therefore, that the brief telephonic discussion between Attorney Rothman and the court regarding recusal was nondescript, de minimis, and had no conceivable effect on the administration of the Metropolitan Metals, Inc. case. Moreover, the conversation was followed by a written disclosure in the form of the letter of April 18, 1995 and an opportunity for hearing thereon heard July 25, 1995.

■ We next turn our attention to whether Attorney Rothman violated the third provision of Rule 3.5 of the Pennsylvania Rules of Professional Conduct by engaging "... in conduct disruptive to a tribunal." The official comment to Rule 3.5 is helpful in that it suggests that "A lawyer is required to avoid contributing to a violation of [the Code of Judicial Conduct]."

Certainly, Attorney Rothman had no control over the fact of my appointment to the bankruptcy bench on January 10, 1992. Moreover, it is fair to assume that Attorney Rothman considered me a potential witness in a litigation where I was a named defendant whether I later withdrew as bankruptcy trustee, became a bankruptcy judge, or changed professions entirely. I conclude that a mere suggestion that I might be a witness in a proceeding unrelated to the Metropolitan Metals, Inc. case is neither inappropriate nor "disruptive to a tribunal."

This takes us to the second issue which was raised by the court in its sua sponte

Order of June 19, 1995, setting July 25, 1995 as a date for a hearing to consider its own recusal. The facts are the same and the issue for the court to consider is whether the fact that Edward Rothman, Esquire, represented me in my capacity as a bankruptcy trustee in an unrelated case and now considers me a possible witness in that unrelated case, should require my recusal as judge in the Metropolitan Metals, Inc. case.

For guidance, we initially turn to the controlling statute, 28 U.S.C.A. § 455, the relevant portions of which, read as follows:

## § 455. Disqualification of justice, judge, or magistrate

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding. ...

(e) No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

In the case of *In re Jewelcor, Inc.,* 166 B.R. 41 (Bkrtcy.M.D.Pa.1994), we identified the following eight factors as bearing upon the issue of whether a court should recuse itself under Section 455(a): (1) the Court's unjustified reliance on a reversed issue; (2) judicial accusations of possible perjury; (3) judicial accusations of bad faith and abuse of process; (4) exhibition of a personal interest in the outcome of the litigation; (5) the assumption of an adversarial position; (6) the Court's alignment with a party to the litigation; (7) attendance by the court to a seminar oriented toward one side of the litigation; and (8) pejorative comments directed at an industry of which one of the parties is a part.

While these factors are not exhaustive, they do identify, in objective terms, some of the ways in which a judge's "impartiality might reasonably be questioned", a necessarily "subjective" concept.

Only one of these factors is reasonably called into question in this immediate case. That is, can this court be seen to be "aligned" with one party to this litigation.

In order to gain insight into this question, we turn to the Code of Conduct for United States Judges and specifically to Canon 3 which reads, "A judge should perform the duties of the office impartially and diligently."

The test as to whether a judge should disqualify himself is two-fold: (1) whether the judge feels capable of disregarding the relationship; and (2) whether others can reasonably be expected to believe that the relationship is disregarded. *Advisory Opinion No. 11 (1970) and Advisory Opinion No. 70 (1985), Interim Advisory Committee on Judicial Activities.*

With regard to the first test, it is important to note that Edward Rothman, Esquire, has never been my personal lawyer. His only relationship to me was as counsel in my capacity as trustee in the Minichello/Prestige Pool case, a case that was referred to Judge Woodside when I was appointed and a case in which my trusteeship terminated upon my appointment four years ago. Although my relationship with Edward Rothman, Esquire, has been cordial, it has never been on a social level nor have we had anymore than infrequent contact. Edward Rothman, Esquire, practices law in Harrisburg and I practiced law in Wilkes–Barre, Pennsylvania, approximately one hundred miles north. I would estimate that we had been involved in the same case less than ten times over my entire career as a practicing lawyer from 1972 into 1992. To my recollection, he has never represented me in any other case other than Minichello/Prestige Pool. Based on these facts, I can say, with no equivocation, that I am completely capable of disregarding the former relationship that Attorney Rothman and I have had in one case.

Having concluded that, we must address the second part of the two-fold test, i.e. whether others can reasonably be expected to believe that the relationship is disregarded. Put in more objective terms, "[t]he court must consider whether an astute observer in [legal or lay] culture would conclude that the relation between judge and lawyer (a) is very much out of the ordinary course and (b) presents a potential for actual impropriety if the worst implications are realized." *United States v. Murphy,* 768 F.2d 1518, 1537 (7th Cir.1985).

The *Murphy* court traced the history of the evolving relationship between lawyers and judges to conclude that the "reasonable question" about a judge's impartiality is a product of the times within which such question was raised. As an example, the court cited the acceptability of the practice of Supreme Court judges and lawyers living in boarding homes together and eating together during the days of the Marshall court from 1815 to 1835 while such practice would indeed be questioned in this current era. The *Murphy* court further observed that, while courts need not disqualify themselves just because a close friend appeared before them as a lawyer, " . . . the unusual aspects of a social relation may give rise to a reasonable question about the judge's impartiality." *Id.* at p. 1538.

In *United States v. Martorano,* 866 F.2d 62 (3rd Cir.1989), the defendant maintained that the judge who sentenced him should have been recused since he acted as a witness on behalf of the defendant's former counsel at a guilty plea. The defendant contended that criticism of the judge's testimony resulted in the judge sentencing the defendant to a more severe sentence than he would have otherwise. In analyzing these facts, our circuit concluded that "[m]otions to recuse under 28 U.S.C. § 455(a) must rest on the kind of objective facts that a reasonable person would use to evaluate whether an appearance of impropriety has been created, not on 'possibilities' in unsubstantiated allegations." *Id.* at p. 68. In dismissing the allegation that the judge should have recused himself, the court concluded that " . . . only 'speculation' would lead a reasonable person to conclude, absent any evidence, that he had reimposed the same sentence not for the factors that underlay his original choice but to rehabilitate the damage allegedly done to his reputation by the newspaper stories." *Id.* at p. 68.

Implicit in this holding was the conclusion that merely being called as a witness on behalf of a lawyer who appeared before the judge does not represent sufficient facts to require the recusal of the court. Our facts in this case are even further removed in that the possibility alleged is that I may be a witness in an unrelated case in which Attorney Rothman is the representative. As in *Martorano,* absent specific facts that would suggest an impropriety, recusal would not be required.

Merely because Attorney Rothman represented me in an unrelated case, which representation had heretofore terminated, cannot, in and of itself, cause recusal. Whether or not my successor prevails or fails in the defense of that litigation pending in Minichello, is irrelevant to me personally and can have no impact on me personally either financially or otherwise.

Applying the *Murphy* test of the existence of a "reasonable question about impartiality", we conclude that (1) the relationship that Attorney Rothman had with myself was not out of the ordinary course and (2) under any foreseeable scenario, no actual impropriety could be realized. I therefore conclude that my own motion to consider recusal should be dismissed for those reasons indicated in this opinion.

We lastly turn to the matter of whether the Orders issued by Judge Woodside after his November 6, 1984 Memorandum of Recusal should be nullified. While we have gained significant insight into the standards by which a judge should recuse himself, we still must question the jurisdiction by which one bankruptcy judge can "reconsider" the decisions of a fellow bankruptcy judge. While other alternatives may be available, it is beyond question that a bankruptcy judge, under the provisions of Federal Rule of Bankruptcy Procedure 9024, has the power to invalidate a judgment, order or proceeding. Notwithstanding that conclusion and without limiting Enos to relief under that rule, it would be manifestly unfair to reconsider the various orders, as we have been asked to do, without the joinder of those entities and individuals that may be affected by that decision. It is for that reason that we direct Enos, under Federal Rule of Bankruptcy Procedure 9014, to comply with the terms of Federal Rule of Bankruptcy Procedure 7019, by joining as a party respondent, those individuals and entities that would be affected by an invalidation of those orders alleged by Enos to be void.

Our Order is attached.

In re William SHAFFER, Jr., t/a Bill Shaffer Construction, Debtor.

Joseph ATCAVAGE and Jacqueline Atcavage, Plaintiffs,

v.

William SHAFFER, Jr., t/a Bill Shaffer Construction, Defendant.

Bankruptcy No. 5–95–00111.
Adv. No. 5–95–0367.

United States Bankruptcy Court,
M.D. Pennsylvania.

March 17, 1997.

Michael R. Mey, Scranton, PA, for Debtor/Defendant.

Robert T. Panowicz and Christine Trottini, Wilkes–Barre, PA, for Plaintiffs.

David Gniewek, Trustee in Bankruptcy, Milford, PA.

## OPINION AND ORDER

JOHN J. THOMAS, Bankruptcy Judge.

Joseph and Jacqueline Atcavage ("Plaintiffs") have filed a Complaint objecting to the dischargeability of a certain obligation they say is owed by William Shaffer, the Debtor.

The Debtor is the nephew of the Plaintiffs. The Plaintiffs and the Debtor entered into an agreement dated August 29, 1993 by which Bill Shaffer Construction, a trade name of the Debtor, would complete a residence for the Plaintiffs at 101 Watson Street, Wilkes–Barre Township, Luzerne County, Pennsylvania. The building was to be of a modular type manufactured by Northeast Homes Corporation, Hummelswharf, Pennsylvania, delivered on site, and finished by the Debtor. Implicit in the construction agreement was the understanding that the Debtor, William Shaffer, purchase the home on the Plaintiffs' behalf and finish it on site, after which the Debtor would be paid by the Plaintiffs. (*See* Defendant's Exhibit 7, paragraphs 3 and 9.) Financing for this construction was arranged through First Star Savings Bank. The closing occurred on November 2, 1993.

Curiously, on the following day, the Plaintiffs executed a Mortgage and Security Agreement in favor of the manufacturer of the modular home, Northeast Homes, effectively guaranteeing the Debtor's obligation to the manufacturer.

Unfortunately, upon delivery, in late 1993 or early 1994, the home arrived with improper support beams in place, which allowed a twisting and buckling during transport and placement on the foundation. As a result of this movement, numerous defects in the structure existed at the time of delivery.

The Debtor expended considerable extra time and money in addressing the damages caused by transport, some of which remain. Nevertheless, the Plaintiffs were sufficiently satisfied to authorize the release to the Debtor of all funds held by the mortgagee bank

which financed the construction. The Plaintiffs may not have been aware that Northeast Homes was partially unpaid for the modular by the Debtor.

Thereafter, the manufacturer, Northeast Homes, made demand on the Plaintiffs for the balance owed to them by the Debtor. That balance was $19,931.38.

Northeast Homes was in a position to pursue the Plaintiffs on two theories of recovery: first, by filing a mechanic's lien against the property notwithstanding the existence of a Stipulation Against Liens executed between the Debtor and the Plaintiffs; and second, by suing on the executed "Mortgage and Security Agreement" which obligated the Plaintiffs to pay for the house purchased from Northeast Homes Corporation by William Shaffer. The record indicates that, on March 10, 1995, Northeast Homes filed a mechanic's lien claim against the Plaintiffs.

While not disputing that they signed the Mortgage and Security Agreement, the Plaintiffs maintain that it was presented to them after closing when Bill Shaffer told them it was an "order form for the house." (Transcript of 6/25/96 at 20.) The Plaintiffs said they signed this document without reviewing it.

The Debtor, on the other hand, indicates in his testimony that the Plaintiffs read this document more than once and executed it only when they were sure of its meaning.

The Plaintiffs argue that these facts establish grounds for denying the Debtor the dischargeability of his obligation to the Plaintiffs.

The Complaint did not specify the subsection of 11 U.S.C. § 523 under which the Plaintiffs hope to succeed. The Court, at trial, focused on Section 523(a)(2) (fraud) and Section 523(a)(4) (fraud or defalcation while acting in a fiduciary capacity) as constituting the gravamen of their cause of action.

The Plaintiffs have the burden of proof by a preponderance of the evidence with regard to a complaint objecting to the dischargeability of a debt. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Since the overriding purpose of the Bankruptcy Code is to provide the debtor with a fresh start, exceptions to discharge are strictly construed against the creditor and liberally construed in favor of debtors. *In re Cohn,* 54 F.3d 1108, 1113 (3rd Cir. 1995). The benefit of a liberal construction is only available to the "honest" debtor and, therefore, a finding of fraud would deny the debtor of this advantage. *In re Cohen,* 106 F.3d 52, 58–59 (3rd Cir.(N.J.)).

While I do not completely understand the reason why the "Mortgage and Security Agreement" identified as Plaintiffs' Exhibit No. 1 was not executed at closing, I am satisfied that the presumption that one who has signed a document, has read and understood it, should be dispositive. *McCready's Estate,* 316 Pa. 246, 175 A. 554 (1934).

Neither side disputes the conclusion that the execution of this document on November 3, 1993, was a voluntary act by the parties. Further, the Court finds that both Plaintiffs and Defendant/Debtor are intelligent people capable of understanding the significance of the paperwork which bore their signature. The Plaintiffs should have been aware of the difference between a purchase order and a mortgage. On August 30, 1993, they executed a document entitled "Standard Purchase Order" for the structure at issue. (Defendant's Exhibit 2.) Furthermore, the day prior to the execution of the Northeast Homes mortgage, they executed a mortgage in favor of First Star Saving Bank. Moreover, the document that was shown to them on November 3, 1993, was the only document presented to them that day, which reduces the possibility that it was mistakenly signed. Neither Jacqueline Atcavage, Co–Plaintiff, nor Michael Richardson, witness to the Northeast Homes mortgage, testified at the time of trial. Both were signatories to the document.

The Court finds that the Debtor, William Shaffer, Jr., paid in excess of $25,000.00 to Northeast Homes toward payment of this modular home.

We now turn to the question of whether these facts are grounds for denying the dischargeability of any obligation that the Debtor/Defendant has to the Plaintiffs.

■ 11 U.S.C. § 523(a)(2) reads, in part, as follows:

### § 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

In interpreting the meaning of "fraud," we will accept the guidance of a recent Supreme Court decision and turn to the Restatement (Second) of Torts § 537 (1976). *Field v. Mans*, — U.S. —, —, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995).

### § 537. GENERAL RULE

The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if,

(a) he relies on the misrepresentation in acting or refraining from action, and

(b) his reliance is justifiable.

See also 204 B.R. 143, 1997 WL 9994.

that the funds were not received for the beneficial interest of Goldberg. Thus, it meets the classic definition of when a resulting trust arises. Restatement (Second) of Trusts § 404 (1959).